## JACKSON, ex dem. GILBERT, against WOOD.

Where a patent for a lot of land was granted in 1791, to an *Oneida Indian*, as a bounty for his services, as a soldier, during the revolutionary war, " to hold unto him and his heirs and assigns for ever," and the patentee died leaving two sons, his heirs, who sold and conveyed the land to *A.* It was held, that the sale and conveyance were void. *Indians*, residing in the state of *New-York*, cannot, according to the constitution and laws of the state, alienate their lands, without the consent of the legislature, or the approbation of the surveyor-general.

THIS was an action of ejectment, brought to recover part of lot No. 16. in the town of *Junius*, in *Seneca* county, and was tried at the *Seneca* circuit in *June*, 1810.

The plaintiff produced an exemplification of letters patent, issued the 29th day of *January*, 1791, from the people of the state of *New-York*, giving, granting and confirming unto Lieutenant *Hongost Tewahengriahaken*, an *Oneida Indian*, as a bounty for his services during the revolutionary war, the lot in question " to have and to

hold the above described and granted premises, unto the said *Hongost Tewahengriahaken, his heirs and assigns,* as a good and indefeasible estate of inheritance, for ever." It was then proved that the patentee was dead; and that after his death, on the 2d *day of April,* 1808, *his two sons and heirs, Hongost* and *David,* sold the premises in question to the lessor of the plaintiff, and gave him a deed accordingly, which was duly proved and recorded.

The defendant objected to the plaintiff's recovering, on the ground, that the above heirs (being *Oneida Indians* and residing with the *Oneida* tribe) were *aliens;* and therefore could not take by descent, which objection was overruled. But the judge decided, that a deed from the indian heirs was not valid in this case, on the ground that indians are prohibited by law from selling their lands; and the plaintiff was nonsuited.

A motion was made to set aside the nonsuit, and for a new trial.

*Cady,* for plaintiff. The 37th article of the constitution, for the purpose of preserving peace and amity with the indians within the state, declares, that no sales or purchases from them shall be valid, unless made under the authority, and with the consent of the legislature.

The act passed the 18th *March,* 1788, (*Greenleaf's* edit. vol. 2. p. 194.) 11th sess. c. 85. is founded on the constitution, and merely adds a penalty for any violation of the constitution in this respect. The act of the 4th *April,* 1801, among the revised laws, 24th sess. c. 147. merely follows the constitutional prohibition, and adds a penalty. It does not enlarge or extend that prohibition. The framers of the constitution could never have had in view a sale by an individual indian, who was a freeholder. The preamble to the article clearly shows that they contemplated the indians as tribes or nations, with whom it was necessary to preserve peace, for the

safety and tranquillity of the state. The acts of the le-gislature relate only to public lands. There is nothing in the constitution, or the acts of the legislature, fairly construed, that incapacitates an indian, who is a free-holder, from alienating his lands.

By the act concerning tenures, (10th sess. c. 36. s. 1.) it is declared lawful for every freeholder to alienate or dispose of his lands or tenements, at his pleasure. The legislature have allowed indians to become freeholders ; and by issuing patents of lands to them, their heirs and assigns, they are, by the very terms of such patents, au-thorized to sell and dispose of the lands granted to them.

The unrestrained power of alienation is an inseparable incident to an estate in fee-simple; and when an estate once becomes assignable, it for ever continues assigna-ble. By granting an estate of inheritance, or fee-simple, to this indian, the legislature have given him the power to sell.

It cannot be objected, that the indians are aliens, for by the act of the 28th *February*, 1789, (12th sess. c. 42. *Greenleaf's* edit. *Laws*, vol. 2. p. 279.) lands held by any inhabitant or citizen of the state, since the 7th *January*, 1770, cannot be defeated by any pretence of alienism; nor can any plea or pretence of alienism be objected, as to lands acquired between the 3d *September*, 1783, and the time of passing that act. Though the patent was issued in this case in 1791, it can make no difference, as all lands to which soldiers who have died were enti-tled, are declared to have been vested in them in 1783.

The legislature, by their act, 22d sess. c. 13. granted lands to *John Dennie*, an indian, and took a mortgage from him.

*Gold*, contra. 1. Indians cannot take lands by descent. No descent can be cast but on persons who owe alle-giance. If a *denizen* in *England* purchased lands, to

him and his heirs, yet his heirs could not inherit.* Nor is it, as Lord *Coke* observes, climate or soil that makes a natural born subject, but *allegiance* and *obedience;* for if any enemy within the kingdom have possession of a town or fort, and have issue born, such issue is no subject of the king, though born on the soil, for he is not born under his allegiance and protection.

The treaty of peace between the *United States* and *Great Britain*, which allowed *British* subjects to hold lands, did not permit them to descend; and this defect was, afterwards, supplied by the treaty of 1794.

" Citizens," says *Vattel*,† " are the members of civil society; bound to this society by certain duties, and subject to its authority, they equally participate in its advantages." Are these indians citizens or subjects of this state? Do they owe allegiance or obedience? Can the state compel them to bear arms, to pay taxes, or to perform any other duties of a citizen?

Again, how are these lands to descend? According to the law of descents established by this state, or according to the customs and usages of the indian tribe?

From the well known condition of the indians, they are presumed to be wholly ignorant of our laws; they are *inopes consilii*, and considered as wholly incapable of contracting. If the tribes or nations, acting in their collective capacity, are considered as incapable of selling their land, without the consent of the legislature, *à fortiori* an individual must be regarded as incompetent.

The act of the 4th *April*, 1801, (24th sess. c. 147.) speaks of purchases made of any *indian* or *indians ;* thereby clearly intending to prohibit purchases from an individual as well as from a tribe.

Because an indian is a freeholder, it does not follow that he has a right to convey. *Infants, femes covert*, or persons *non compos mentis*, may be freeholders; yet they are incapable of conveying their lands while under such legal disability. The right of transmitting proper-

NEW-YORK,
Nov. 1810.

JACKSON
v.
WOOD.

* 7 *Co.* 6, 7. *Calvin's* case,

† *Vattel*, b. 1. c. 19. s. 212.

‡ *Cruise's Dig.
Descent,* tit.
29. c. 2. s. 2.

ty by descent, is not derived from the law of nature; but from the positive and arbitrary laws of civil society,* which are variously modified in different states, according to principles of public policy or convenience. The act of the 28th *February,* 1789, was not prospective; it referred only to past cases.

In the 21st section of the act of the 4th *April,* 1801, the lands of the *Brothertown Indians* are made descendible to their heirs, according to our law of descents; and the widow of a deceased indian is declared entitled to remain in the house of her husband, during her widowhood; and the superintendants are to assign her as much land as they may think necessary; which is wholly different from the law of dower as to our citizens. But these benefits and privileges are not extended to any other tribe of indians. As to other indians, no person can purchase or take lands from them, without the consent of the legislature.

*Cady,* in reply. The case mentioned from *Coke* is that of the issue of an alien enemy. But indians born in our country, and who have fought the battles of our revolution, stand on a different ground.

An *African* brought into this country and sold as a slave, if he is afterwards manumitted, becomes entitled to all the rights and privileges of a native citizen, and may hold and transmit lands. Is an indian possessed of less understanding than an *African?* On what principle of justice or reason should they be considered less competent, or less entitled to hold and transfer property?

If an indian patentee can convey, why may not his children, who take by descent, also convey?

KENT, Ch. J. delivered the opinion of the court. It is stated in the case, that the heirs of the indian patentee, under whom the lessor of the plaintiff claims, by a deed of the 2d of *April,* 1808, are *Oneida Indians,* and resi-

4

ding with the *Oneida* tribe. The plaintiff shows the deed without proving the consideration, or showing any particular legislative sanction for the conveyance, and the question is, whether the deed be valid in law.

It is a fact too notorious to admit of discussion or to require proof, that the *Oneida Indians* still reside within this state, as a distinct and independent tribe, and upon lands which they have never alienated, but hold and enjoy as the original proprietors of the soil. Their political relation to this state is peculiar, and *sui generis.* If they are not *aliens* in every sense, because of their dependence as a tribe, and their right to protection, they cannot be considered as subjects born under allegiance, and bound, in the common law sense of the term, to all its duties. But this is a question which I do not wish or mean to discuss, and I have only alluded to the condition of the *Oneidas*, to show that they come within the general provision in our constitution and laws, relative to purchases of land from the *indians* within this state.

The 37th article of the constitution declares that no purchase, or contract for the sale of lands which may be made with or by the indians within this state shall be valid, unless made under the authority and with the consent of the legislature.

This provision has been generally supposed, and perhaps correctly, to refer to purchases from the indians, as a tribe or community; for indians generally hold their lands in common, and do not know of individual property in land. But the legislature, in their earliest provision on the subject of these indian purchases, carry their prohibition to all purchases from *individual* indians, as well as from the tribe; for the act of the 11th sess. c. 85. declares it to be a public offence to purchase, or contract for the sale of lands within this state, *with any indian or indians* residing within the limits of this state. The same prohibition, in the same words, was included

in the revised laws of 1801 ; (*Laws*, vol. 1. p. 464.) and the act of 1801 goes further, and declares, (sect. 2.) that no person shall maintain an action on any contract, against any *Stockbridge* or *Brothertown Indian*, or *against any indian, residing on any lands reserved to the Oneida, Onondaga or Cayuga Indians.* If no suit will lie against the indian himself on such contract, it is because the law will not recognise it as valid, unless made under the sanction which has since been provided. It is difficult to reconcile this provision in the act, with the validity of the deed before us. The various regulations in the act of 1801, all show the sense of the legislature, that an indian, in his individual capacity, is, in a great degree, *inops consilii*, and unfit to make contracts, unless with the consent and under the protection of a civil magistrate. The law not only protects indians from any suit upon their contracts, but it declares specially, that all alienations of land by the *Brothertown* and *New-Stockbridge Indians* are void. These are just and humane guards against the imposition and frauds which that unfortunate people have not the power to withstand.

The same provisions prevail in the *Spanish* colonies. None of the indians within the *Spanish* dominions can dispose of their real property, without the intervention of a magistrate. But the act of the 32d sess. c. 63. relates to the very subject before us. It provides that the heirs of indians, to whom lands have been granted by this state, for military services, shall be, and are made capable of taking and holding any such lands by descent, in the same manner as if such heirs were citizens of this state, at the death of their ancestors ; and that every conveyance, thereafter to be executed by such patentee, or his heirs, to any citizen of this state, for any such land, shall be valid, if executed with the approbation of the surveyor-general. The act of the next, or 33d sess. c. 25. contains directions for the surveyor-general, calculated to secure, the more effectually, jus-

tice to the patentee and his heirs; and there is a proviso in each of these acts, that nothing in them shall be construed to confirm or affect any prior conveyance from such patentee or his heirs. Such conveyances remain as if those acts had not been passed; and from the construction which I give to the prior acts of the 11th session, and of 1801, such contracts and conveyances, if executed by *indians residing with their tribe*, were absolutely void. The case is within the letter, and certainly within the spirit, of the several statutes on this subject. These statutes ought to be construed liberally for this purpose. The principles of public policy, a sense of justice and humanity, the honour of the state, and the conclusions of law, require us to consider such contracts as made with persons unfit to contract without the advice of disinterested counsel. I allude now only to contracts made with individual indians, and not to purchases made from the tribe, in their national or collective capacity. The nation, by its chiefs in council, is to be presumed competent to judge of its rights, and to preserve them; and private purchases from the nation or tribe are declared void upon other grounds.

The motion on the part of the plaintiff to set aside the nonsuit, is, therefore, denied.