CORNELIUS PLUMMER, Respondent, *v.* LORENZO HUBBARD, Appellant.

Fourth Department, November 14, 1923.

Indians — contracts — plaintiff, Seneca Indian, left reservation, purchased real estate and entered into business — judgment was secured against him and his land sold to defendant — plaintiff returned to reservation and brought this action in ejectment — plaintiff liable under Indian Law, § 2, on contracts made while away from reservation.

The plaintiff, a Seneca Indian, who left the Indian reservation in 1907 and purchased real property and entered into business thereon may be sued on a debt contracted by him while he was not residing on the reservation, and a sale of his real property on a judgment so recovered is valid and he cannot, after he returns to the reservation, maintain an action in ejectment to recover possession of the real property thus sold.

Section 2 of the Indian Law, which provides that an Indian shall be liable on his contracts not prohibited by law and that an Indian may take, hold and convey real property the same as a citizen, but that no person shall maintain an action on a contract against any Indian of the Seneca nation or against any of their Indian friends residing with them on their reservation in this State, does not prevent one who contracts with a Seneca Indian while he is not residing on the reservation from enforcing the contract in an action in the courts.

APPEAL by the defendant, Lorenzo Hubbard, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Cattaraugus on the 13th day of October, 1921, upon the decision of the court rendered after a trial before the court, a jury having been waived, adjudging the plaintiff the owner and entitled to possession of certain real property.

*James E. Bixby*, for the appellant.

*J. M. Seymour*, for the respondent.

DAVIS, J.:

The action is for ejectment. The real property in question has been sold on execution issued upon a judgment against the plaintiff. The defendant is in possession of the property by virtue of a sheriff's deed. The plaintiff claims that the judgment was void.

The admitted facts are these: On August 5, 1907, the plaintiff, then a member of the Seneca Nation of Indians, purchased the premises in question for the sum of sixty dollars, and they were conveyed to him by deed recorded in Cattaraugus county clerk's office October 3, 1907. He went into possession immediately. The property was located seven miles from the Seneca Indian reservation. He erected a building and conducted a small store and did blacksmithing, residing there with his wife from about 1908 until the fall of 1915. The property was assessed to him on the assessment roll of the town from 1912 to 1916 at a valuation of $100. About 1915 he bought a farm of fifty-three acres in the same town and went to reside upon it, leaving it in the spring of 1917, when with his wife he returned to the Cattaraugus Indian reservation. This farm was assessed to him in 1916 at a valuation of $1,100. In October, 1916, he was sued in Justice's Court of the town of Dayton by John B. Moss, and not appearing, judgment was thereafter duly rendered against him for $52.13, damages and costs, upon evidence of indebtedness for groceries and merchandise sold by Moss to him. Thereafter, upon due filing of transcript and issuance of execution, the sheriff sold the parcel of real estate in question.

The regularity of the judgment is not questioned except upon the single ground that it is void because of the prohibition contained in section 2 of the Indian Law (Consol. Laws, chap. 26; Laws of 1909, chap. 31). That section is as follows: " An Indian shall be liable on his contracts not prohibited by law; and a native Indian may take, hold and convey real property the same as a citizen. Upon becoming a freeholder to the value of one hundred dollars he shall be subject to taxation. No person shall maintain an action on a contract against any Indian of the Tonawanda nation, the Seneca nation or Onondaga tribe, nor against any of their Indian friends residing with them on their reservations in this State, and every person who prosecutes such an action shall be liable to treble costs to the party aggrieved."

The language of the statute, as may readily be seen, is somewhat

ambiguous and contradictory. An Indian may not be liable on his contracts in a legal sense if he cannot be sued to enforce them.

It becomes necessary then to ascertain what was the intent of the Legislature in respect to the liability of an Indian on his contracts. When the intent is not clear from the language of the statute, we may ascertain by the light of surrounding circumstances what policy was in the legislative mind.

The status of the Indian nations or tribes in both the State and Nation, as has often been said, is anomalous. (*Seneca Nation of Indians* v. *Appleby*, 196 N. Y. 318; *Elk* v. *Wilkins*, 112 U. S. 94.) The New York Indians, known as the Six Nations, as a result of treaties both before and since the organization of the State government, sustain a relation toward this State and its government different from that sustained by other Indian tribes or nations toward other States. (*George* v. *Pierce*, 85 Misc. Rep. 105; *Seneca Nation* v. *Christie*, 126 N. Y. 122; writ of error dismissed, 162 U. S. 283.) Indians, though born within the United States, are not citizens thereof unless naturalized or made so by statute or treaty. (*Elk* v. *Wilkins*, *supra*.) Nor are they citizens of this State. (*Hastings* v. *Farmer*, 4 N. Y. 293; *Seneca Nation of Indians* v. *Appleby*, *supra*.) They are wards of the Nation and of the State. (*United States* v. *Kagama*, 118 U. S. 375, 383; *George* v. *Pierce*, *supra*, 120.) Whatever rights they have are regulated by treaty or statute.

In the absence of Federal statute or existing treaty or State statute, a State court has jurisdiction of an action on contract in favor of a white man against an Indian belonging to a tribe and a particular reservation (*Stacy* v. *LaBelle*, 99 Wis. 520; *Kel-tuc-e-mun-guah* v. *McClure*, 122 Ind. 541; 7 L. R. A. 782), and an Indian may be sued in tort, though it arose on a contract. (*Singer Manufacturing Co.* v. *Hill*, 60 Hun, 347.)

When the Revolutionary War closed treaties had been made with the Six Nations. While maintaining their tribal organizations, they became subject to the sovereignty of the State. At that time they were barbarous and uneducated. Possessing fertile lands advantageous for settlement, they were exposed to the dangers of imposition, fraud and unconscionable bargains. Early in its history the State by constitutional and statutory enactment sought to protect their rights by prohibiting entry upon their lands and forbidding the alienation of such lands or the making of a contract in relation thereto. (*Jackson* v. *Wood*, 7 Johns. 290; *Chandler* v. *Edson*, 9 id. 362.) The early statutes of 1790 and 1801 (Laws of 1790, chap. 29; rep. by Laws of 1801, chap. 80 [1 K. & R. 619, chap. 189; Reprint Laws of 1801, chap. 193]; Revised Acts of 1801, chap. 147 [Reprint Laws of 1801, chap. 147];

1 K. & R. 464, chap. 147), and the early statute of 1807 (Laws of 1807, chap. 117, § 6) extending the inability to be sued to the Seneca Indians, were apparently repealed by chapter 202 of the Laws of 1812-13 (2 R. L. 556) and revised and supplemented by chapter 92 of the Revised Laws of 1813 (2 R. L. 153), in which it was provided (§ 2) that "no person shall sue or maintain any action on any bond, bill, note, promise or other contract hereafter to be made," against certain Indians, including the Seneca tribe or nation. The protection of this statute was held to extend not only to Indians residing on the reservation, but to suits against such Indians wherever their residence; and the statute was considered as a "guard against the imposition and frauds to which that unfortunate race of men are exposed, from their ignorance and mental debasement." (*Dana* v. *Dana,* 14 Johns. 181.)

The doctrine was reaffirmed in *Hastings* v. *Farmer* (4 N. Y. 293), where it is said: "The obvious intention of the Legislature was to leave the Indian free to make contracts relating to personal property; and when made, if unexecuted, to leave him equally free to perform them or not as he pleased. The statute allowed the citizen to deal with the Indian if he would, but closed the door upon him when he came to enforce his contract by action. The statute is benign and humane in its purpose and should receive a liberal construction — such a construction as will not defeat the end which the Legislature had in view."

Thus far the purpose of the Legislature as interpreted by the courts is clear. The right to contract is not denied, but parties contracting with certain Indians may not resort to the courts to enforce them.

In chapter 87 of the Laws of 1843 (entitled "An act to enable resident aliens to hold and convey real estate"), section 4 provides: "Any native Indian may, after the passage of this act, purchase, take, hold and convey lands and real estate in this State, in the same manner as a citizen; and whenever he shall have become a freeholder, to the value of one hundred dollars, he shall be liable on contracts, and subject to taxation and to the civil jurisdiction of the courts of law and equity of this State, in the same manner and to the same extent as a citizen thereof."

Here the purpose seems clear. When an Indian shows sufficient enterprise and thrift to become the owner of real estate of the value of $100, he may make contracts enforcible in the courts. He could not hold real estate in fee in his tribal state (*Strong* v. *Waterman,* 11 Paige, 607); so it seems to be contemplated that he might abandon the reservation and seek his fortune amongst the white people. This indicates a change of policy and establishes

a class of Indians that may become liable on their contracts, to wit, " freeholders." From this class there was no exception of the Seneca or other Indians.

The *Hastings Case* (*supra*) was decided in the Court of Appeals in 1850. The cause of action arose in 1844, and Farmer was an Indian residing with his tribe on the Onondaga reservation, and evidently not a freeholder. The statute of 1843 was not referred to in the opinion, but the case was decided under the statute of 1813.

Both statutes were in force when the Legislature in 1888 appointed a special committee (called the Whipple committee) to investigate the Indian problem. This committee made a thorough investigation into the condition of the various tribes of Indians, examining many witnesses among the Indians themselves, and among those who by their association with them in religious and educational work were competent to give information. A report of the investigation was made to the Legislature in 1889. This report said the Indians " have been kept as ' wards ' or children long enough," and recommended that all existing laws excepting those prohibiting sale of liquors to them and intrusion upon their lands be repealed, and that the laws of the State be extended over them to help them eventually to become self dependent and self respecting. (See Assembly Documents, 1889, vol. 7, No. 51, pp. 78, 79.) This report was before the Statutory Revision Commission when it undertook in 1891 to revise the Indian Law and in 1892 to report to the Legislature, and its " valuable aid " is acknowledged by the Commission. (See Senate Documents, 1892, vol. 5, No. 10, pt. 3, p. 2112.)

In 1892 the Indian Law was enacted to take effect May 1, 1893. (Gen. Laws, chap. 5; Laws of 1892, chap. 679.) Section 2 provides: " An Indian shall be liable on his contracts not prohibited by law; and a native Indian may take, hold and convey real property the same as a citizen. Upon becoming a freeholder to the value of one hundred dollars he shall be subject to taxation."

The act of 1813 was repealed. The Constitution of 1894 (Art. 1, § 15), re-enacting similar provisions of preceding Constitutions, prohibited purchase or contract for sale of Indian lands. This clearly refers to those held by original grant from the State. We may assume that the Whipple report had influence in the enactment of the new statute. Here was clear evidence of another decided change of policy.

The statute just quoted extends the right of an Indian to contract to a class greater than freeholders. It did not, in terms, except any tribe or nation or those living on a reservation. By

chapter 229 of the Laws of 1893 (approved March 27, to take effect May 1, 1893) the law was amended so that section 2 reads as it now does in the statute under consideration. It seems likely that the Legislature intended then to correct an omission in the preceding statute not yet in effect, specifically excepting Indians on reservations, rather than to make a complete change of policy and return to one it had discredited. There had been no trial of the new one to determine its efficacy or wisdom.

It is reasonably clear in the statutes of 1843 and 1892 already referred to, that the purpose of the Legislature was to open a wider field for advancement and progress to the individual Indian, giving to him some of the rights and responsibilities possessed by a native citizen or an alien. It is generally recognized in our courts and by those who have made special study of the subject, that there are two types of Indian. One lives with his tribe under subjection to the white race in a state of pupilage, where he has only the rights common to the tribe. The other leaves his nation or tribe and takes up his abode among the white population where he would be entitled to all the rights and privileges which would belong to an immigrant from any other foreign people, including the right to be naturalized by authority of Congress. (*Scott* v. *Sandford,* 19 How. [U. S.] 393, 404; The Legal Position of the Indian, 15 Am. Law Rev. 21, 32.)

The Indians of the Six Nations were originally a comparatively intelligent people. The Whipple report (p. 6) says: "Their skill in war was not excelled (*sic*) by their aptitude for civil government." Their chiefs were "renowned for * * * skill and courage in war or famous for eloquence or wisdom in the civil affairs of the league." While it appears that the race has deteriorated, due largely, so it is said, to the association with a poor class of white people and the policy of the State in relieving them of all sense of responsibility, it is common knowledge that this rule cannot be applied to all individuals. Churches and schools have been built on the reservations and Indian children have been given many advantages. Civilizing influences have been at work for a long time. Higher institutions of learning have been founded for their benefit, and others have opened their doors to educate the Indian youth. Some have become educated, and have gone into the learned professions. Others have engaged in farming, business and other enterprises with success. (Judge Pound, Nationals without a Nation, 22 Col. Law Rev. 97.) These at least are not in a condition of "ignorance and mental debasement." (*Dana* v. *Dana, supra.*) Did the Legislature intend that avenues to progress and success should not be opened to members of the Seneca nation?

It is difficult to see how any Seneca Indian youth could separate himself from his tribe and go out among white people and engage in any occupation or business, if the law forbade those with whom he lived to make a contract with him, except at their peril. As Mr. Austin Abbott says in an article on " Indians and the Law " (2 Harv. Law Rev. 167, 178): " It is an axiom in our free government that the existence of remedies is essential to the enjoyment of rights; and nothing is clearer in the problem of the future of the Indians than that adequate means, accessible and comparatively inexpensive to them, for the peaceable adjustment of questions of property, contract and domestic relations, are absolutely essential in order to foster and promote their civilization and good citizenship." If he elects to free himself from a condition of pupilage and become an independent person and deal freely with people, he must be amenable to the same remedies he asks against others. In other words, as has been said " with grave judicial humor, he possesses also ' the unquestionable right to be sued.' " (15 Am. Law Rev. 21, 33.)

It would seem that the Legislature had by this act given an Indian his choice to stay on the reservation and live with his tribe under tribal law and be exempt from suit and free from taxation and having this exemption extend to his guests; or to separate himself from his tribe, buy lands and pay taxes, engage in business, make contracts and incur legal liability under them. This view is supported by other sections of the law which protect him and give him rights as a member of the tribe on the reservation. They make him there subject to tribal law, but outside his rights and remedies are regulated largely by general statutes. (See Indian Law of 1909, §§ 3, 4, 5 *et seq.;* Id. § 46, as amd. by Laws of 1915, chap. 560; *George* v. *Pierce, supra; People ex rel. Mulkins* v. *Jimerson,* 229 N. Y. 438. See, also, Laws of 1923, chap. 605, adding to present Indian Law, § 5-a.) Support of this interpretation is also given by the language of section 2 giving freedom from suit to Indians and their guests " *with them on their reservations.*"

The Seneca nation is a *quasi* foreign nation and its reservation is *quasi* extraterritorial. (*Mulkins* v. *Snow,* 232 N. Y. 47.) There is good reason why members of that nation while living in that territory should be exempt from the jurisdiction of our courts. But it is not so clear why a different rule should apply to members who come within the territorial jurisdiction of such courts, than is applied to other aliens of perhaps no higher intelligence.

If no distinction is to be made as to the legal obligations of those who in an intelligent spirit of enterprise separate themselves from the nation, and of those who remain on the reservation living

in their primitive, tribal state, then the judgment must be affirmed. If we adopt this view, the only Indians who may become liable on contracts are the few who either are remnants of a tribe or have no tribal relation. The first part of section 2 is then comparatively meaningless. But if we may discover in the statute an intent to permit those obtaining the advantages of education and Christian teaching to choose the path of civilization and live among an enlightened people on equal terms, owning real property, improving it, paying taxes, engaging in business and making contracts with the necessary incident of liability, then we must reach a contrary conclusion. Does the statute permit a Seneca Indian to emancipate himself in a legal sense from the restrictions under which he must live on the reservation? It may be of little use to such an Indian to own real estate if he can make no contract enforcible against him to sell it. If he engages in business he may obtain little credit if he incurs no liability on his commitments.

I think the language of the statute must be interpreted to mean that generally an Indian is liable on his contracts, but those of the Seneca nation and others enumerated, together with their guests, may not be sued while living on their reservation.

It appears that the plaintiff for a period of about nine years abandoned his nation and endeavored successfully to make a way for himself in the world. During that time while the owner of real estate, he incurred a small bill for necessaries for his family. Did he escape liability thereon because he had once been a member of the Seneca nation? I think not. The fact that he afterward elected to give up the course he adopted and return to the nation and the exemption from suit he enjoyed before, does not affect the liability he incurred while separated from his nation and living among white people in civilization.

The judgment appealed from should be reversed, with costs, and the complaint dismissed, with costs.

The first finding of fact is reversed in part, and additional findings will be made.

All concur.

Judgment reversed, with costs, and complaint dismissed, with costs. Findings of fact reversed and new findings made in accordance with the opinion.