98 P.2d 838

### TENORIO v. TENORIO.

No. 4435.

Supreme Court of New Mexico.

Jan. 19, 1940.

Dudley Cornell, of Albuquerque, for appellant.

Sam Dazzo, of Albuquerque, for appellee.

SADLER, Justice.

Julian Tenorio, a Santo Domingo Pueblo Indian, while still residing at the Pueblo, and on January 20, 1920, was lawfully married to Maria Chavarilla, a San Felipe Indian girl, then residing at the San Felipe Pueblo. The ceremony was performed by a Catholic priest at the Village of Pena Blanca in Sandoval County, in which county both Indian Pueblos indicated are located, although Pena Blanca is not within the boundaries of either Pueblo. The officiating priest performed the ceremony pursuant to a license theretofore secured by the parties to the marriage from the County Clerk of Sandoval County at Bernalillo. Following their marriage they went to the Pueblo of Santo Domingo to reside and there resided as husband and wife, barring intermittent and temporary separations, until December, 1934, when the wife, Maria, went again to her own Pueblo of San Felipe from which she has never returned to reside with the husband, Julian.

The separation continuing, the husband instituted this suit for divorce against the wife by filing a complaint in the district court of Sandoval County on February 1, 1938, charging abandonment. It set forth also that there were no children of the marriage and that there was no community property. The wife, as defendant, first filed a pleading, denominated a plea in abatement, challenging jurisdiction of the court upon the ground that the parties were members of Pueblo Indian tribes, residing within their Pueblos, wards of the United States of America, and that the Pueblo Indian Tribal Council had exclusive jurisdiction of the subject matter of the suit and over the personal and domestic affairs of its

members. No pleading responsive to the plea in abatement was filed, nor was any testimony adduced at the hearing on the plea. Cf. National Liberty Insurance Company v. Silva, 43 N.M. 283, 92 P.2d 161, on rehearing. Nevertheless, the trial court, "having examined the pleadings and heard arguments of counsel", overruled the plea. Thereupon, the defendant answered, entering a general denial, except to admit the marriage and separation, but by way of further answer alleging:

"1. That the parties hereto are Indian Members of the San Domingo and San Felipe Pueblo Indian Reservation respectively, and wards of the United States of America.

"2. That the parties hereto live together under tribal relation and tribal government, and are subject only to the exclusive jurisdiction of the Congress of the United States of America."

The plaintiff's reply denied the new matter set up in defendant's answer and upon the pleadings thus framed the cause was tried. The trial court, although finding the plaintiff and defendant to be Pueblo Indians residing in their respective Pueblos, both at the time of marriage and of trial, found also that they were bona fide residents of Sandoval County in which said Pueblos are located, and concluded that the court had jurisdiction both of the parties and of the subject matter. It rendered judgment on the merits denying plaintiff's prayer for divorce based upon a finding that defend-

ant's abandonment of Plaintiff was not voluntary but due rather to his mistreatment of her. He appeals assigning error incident to the trial on the merits. The defendant, although prevailing below in the trial on the merits, assigns cross-error upon the denial of her challenge to the jurisdiction. Her right thus to complain being unquestioned, despite her position as appellee (Davidson v. Enfield, 35 N.M. 580, 3 P.2d 979), we must proceed first to dispose of this claim of fundamental error. If sustained, the review is ended.

Thus we have presented in new guise the anomolous position occupied by the American tribal Indian in our national society. It is a question that has afforded the subject of innumerable judicial decisions, both state and federal, as well as to furnish a popular theme for legal essayists and text-writers. In but one instance, however, so far as our research discloses, has there reached the reported page, a decision upon the jurisdiction of a court, other than the tribal court or council of the parties, to entertain a suit in divorce between members of an Indian tribe still living upon Indian lands and maintaining tribal relations. In this case the challenge to the jurisdiction was sustained and the parties relegated to the judicial tribunals of their tribe. The case mentioned is that of Raymond v. Raymond, 8 Cir., 83 F. 721, 723. The opinion was written by the late Circuit Judge Sanborn. It is instructive and unquestionably correct. The more important inquiry is whether it be decisive.

The appeal was from a decision rendered by the United States territorial court for the Northern District of Indian Territory, reported in 1 Ind.T. 334, 37 S.W. 202. The appellee, a white woman and citizen of the United States, had intermarried with a Cherokee Indian and lived with him in the Cherokee Nation. A few months after marriage a decree of divorce was rendered in the husband's favor in a suit between them in the circuit court of the Canadian district, "which was one of the established courts of the Cherokee Nation". Thereafter, the wife, appellee, before the United States Circuit Court of Appeals, procured a certificate of naturalization before the United States Court in the Indian Territory. Two days later she brought this suit in equity against the appellant for divorce and alimony. Two defenses were interposed: First, that the court had no jurisdiction of the parties or the suit, "because the parties to it were both members of the Cherokee Nation"; and, next, that the decree of the Cherokee Court was conclusive and rendered res adjudicata the questions sought to be presented in the United States Court. The first defense being sustained, the second was not considered.

A mere reading of the opinion shows a wide difference in the political status of the Cherokee Indian Nation, two of whose members were before the court, and the Pueblo Indians of New Mexico, two of whose members furnish the actors in the case at bar. The court denominated the Cherokee Nation as "a domestic; dependent nation". Mention is made of the fact that for more than a century the United States had maintained treaty relations with this tribe of Indians "as such a nation". Quoting treaty provisions and congressional acts reserving to the Cherokee Nation exclusive jurisdiction in its judicial tribunals of all civil and criminal matters arising within their territory and expressly excluding from the United States Court in the Indian Territory jurisdiction in such matters, the court said: "This relation of the United States to these Indian tribes thus uniformly maintained by the treaties between them and the United States, and by the express enactment of this act of congress, leave no doubt that the United States court in the Indian Territory is expressly excluded from the right to hear and determine civil suits to which members of the Cherokee Nation are the sole parties. It is conceded that under the laws of that nation the appellee became a member of that tribe, by adoption, through her intermarriage with the appellant. It is settled by the decisions of the supreme court that her adoption into that nation ousted the federal court of jurisdiction over any suit between her and any member of that tribe, and vested the tribal courts with exclusive jurisdiction over every such action. Alberty v. United States, 162 U.S. 499, 16 S.Ct. 864, [40 L.Ed. 1051]; Nofire v. United States, 164 U.S. 657, 658, 17 S.Ct. 212 [41 L.Ed. 588]. The counsel for the appellee seek to escape from this conclusion on the ground that the certificate of naturalization which she obtained from the United States court under section

43 of the act of May 2, 1890, deprived her of membership in the Cherokee Nation, and extended the jurisdiction of the federal court over any controversy she might have with any member of that tribe. But a citizen of the United States who becomes a member of one of the civilized Indian tribes by adoption does not thereby denationalize himself, and does not become an Indian. He remains a citizen of the United States. He still owes support and allegiance to the land of his birth, and is still entitled to her protection against the assaults of every foreign prince, potentate, or power. United States v. Rogers, 4 How. 567, 572 [11 L.Ed. 1105]; City of Minneapolis v. Reum, 56 F. 576, 6 C.C.A. 31, 12 U.S.App. 446. His adoption into one of these tribes has the effect to bestow on him the privileges and immunities of its members, and subjects him to the laws and usages of the tribe, but it has no greater effect. It deprives him of the right to appeal to the federal court for redress for civil injuries he sustains from members of the tribe of his adoption, but it confers upon him the right to have these wrongs redressed in the courts of his adopted tribe. His adoption into an Indian tribe has an effect upon his right to sue in the federal court analogous to that of a change of citizenship from one state to another. A native-born citizen of the state of Missouri has the right to the determination in a federal court of every controversy involving the requisite amount which he may have with a citizen of the state of Illinois. If, however, he becomes a citizen of the state of Illinois, he thereby surrenders that right, and is compelled to submit his controversies with the citizens of that state to its own judicial tribunals. Nor does he cease to be a citizen of the United States because he changes his residence from Missouri to Illinois. Nor would any certificate of naturalization from a federal court remove his disability to sue the citizens of his adopted state in the federal tribunals. Adoption into an Indian tribe has a like effect. It leaves the citizenship in the United States unaffected, but it ousts the jurisdiction of the federal court over controversies between the adopted member and the other members of his tribe, and confers exclusive jurisdiction thereof upon the tribal courts."

Another case, not involving Indians, but holding that residence of a husband and wife on property belonging to the United States at Perry Point, Maryland, was insufficient to give the state court jurisdiction in a divorce suit between the parties, is Lowe v. Lowe, 150 Md. 592, 133 A. 729, 730, 46 A.L.R. 983. The precise point decided is presented in the following language of the opinion, to-wit:

"The appellant, complainant in the cross-bill, filed in the circuit court of Cecil county, was refused a divorce because the jurisdictional residence relied on was residence on property at Perry Point, which property at the time of bringing the suit belonged to the United States, and residence there was not, in the opinion of the trial judge, sufficient to give the court jurisdiction, because it was not within the county. She appeals

from the decree which resulted from that decision. * * *

"The lower court decided that the parties to the divorce proceeding were not residents of Maryland, and therefore, under the provisions of the statute applicable to divorce, the courts of Maryland have no jurisdiction. If the chancellor's decision on this point was correct, it is decisive and conclusive of the case.

"Perry Point, with about 500 acres of land, then in Cecil county, Md., was purchased by the United States in 1918, during the war, and devoted to the manufacture of chemicals for war purposes. A manufacturing plant was erected on it, and also a large settlement of workmen's houses. It now has on it, in addition, hospitals for the care of disabled soldiers under the control of the United States Veterans' Bureau."

The decision of the trial judge was affirmed. Chief Justice Bond and Mr. Justice Urner concurred in the result but in an opinion by the Chief Justice they strongly challenged the correctness of the majority in its conclusion denying jurisdiction for want of residence. The majority opinion pointed out that the question of whether the state court had jurisdiction depended upon the manner of acquiring the property by the federal government. Upon this phase of the case the court said: "From an examination of the authorities on this subject, it appears that there are three principal methods by which the United States may acquire land within a state. First, the method spoken of as the constitutional

method, being that provided by clause 17, § 8, art. 1, of the federal Constitution [U.S.C. A.], which method is by purchase of the land by the federal government from the owners, with the consent of the state wherein the land is located. Acquisition by this method transfers to the federal government exclusive dominion and jurisdiction thereover for all purposes, with the single exception of the right by the state through its officers to serve civil and criminal process on such reservation. Second, by purchase without obtaining the consent of the state, or by condemnation. In such a case the federal government owns the land thus acquired in the same manner as an individual would, and the state has full jurisdiction thereover for all purposes, with the limitation that its jurisdiction cannot be so exercised as to interfere with the essential and necessary operations of the federal government thereon. Third, where the land acquired by the government was the property of the state, such acquisition being by a cession by the state to the federal government in the nature of a gift. If such method be pursued, the state can annex any conditions or reservations to the cession as it may see fit; and, if the federal government takes the land, it accepts it, subject to such conditions or reservations." The court finally concluded: "The great weight of authority is to the effect that lands acquired in accordance with the provisions of the federal Constitution cease to be a part of the state, and become federal territory, over which the federal government has complete and exclusive jurisdiction and power of

legislation. It is therefore clear that persons residing upon the government reservation at Perry Point are not residents of the state of Maryland for the purpose of exercising the right of franchise, for taxation purposes, or for school purposes, for the reason that they reside upon territory belonging to the United States and not the state of Maryland; and in our opinion, for the same reason, they are not such residents of the state as would entitle them to file a bill for divorce in any of the courts of the state. It might be said that it is an unfortunate situation, where, by reason of the fact that the federal government has failed to make provision for such cases, residents upon such reservations are left without any remedy; but this is a condition wherein the only relief which can be given is by the federal Congress."

The status of the Pueblo Indian lands is so different from that of United States property acquired in the "constitutional method" mentioned in the majority opinion in Lowe v. Lowe, that we do not deem the case decisive of the question involved, even if we were prepared to affirm its correctness, a conclusion we should be slow to announce without further study in view of the persuasive reasoning and forceful precedents employed by Chief Justice Bond in his dissent from the majority view.

■ Uninfluenced, then, by the two decisions which present the closest analogy in the facts to the present situation, we look to the Guadalupe Hidalgo Treaty, 9 Stat. 922, the Organic Act establishing the Territory of New Mexico, the Enabling Act preliminary to Statehood; and, finally, to our State Constitution for provisions that may have a bearing upon the question presented. Nothing of consequence upon the subject appears in the Treaty of Guadalupe Hidalgo. The election given Mexican residents of the conquered territory in Articles VIII and IX of the treaty to remove with their possessions to Mexico, or to remain in New Mexico, either as Mexican citizens or to become citizens of the United States at the proper time (to be judged by the Congress of the United States), certainly did not embrace Indians. Indeed, the only reference to Indians in the treaty is to speak of them as "savage tribes" and to extend guaranties to the Mexican government against incursions into its territory by such Indians and to promise "the faithful exercise of its influence and power to rescue" and return to their country any nationals who may have been captured by Indians and brought into New Mexico. Article XI of the Treaty.

In so far as the Organic Act is concerned, the presence of Indians within the Territory, would have gone unnoticed but for the provision in section 3 that the governor of the territory "shall perform the duties and receive the emoluments of superintendent of Indians affairs", etc.

In section 2 of the Enabling Act, it is provided:

"And said convention shall provide, by an ordinance irrevocable without the consent of

the United States and the people of said state—

"First. That perfect toleration of religious sentiment shall be secured, and that no inhabitant of said state shall ever be molested in person or property on account of his or her mode of religious worship; and that polygamous or plural marriages, or polygamous cohabitation, and the sale, barter, or giving of intoxicating liquors to Indians and the introduction of liquors into Indian country, which term shall also include all lands now owned or occupied by the Pueblo Indians of New Mexico, are forever prohibited.

"Second. That the people inhabiting said proposed state do agree and declare that they forever disclaim all right and title to the unappropriated and ungranted public lands lying within the boundaries thereof and to all lands lying within said boundaries owned or held by any Indian or Indian tribes the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the congress of the United States; that the lands and other property belonging to citizens of the United States residing without the said state shall never be taxed at a higher rate than the lands and other property belonging to residents thereof; that no taxes shall be imposed by the state upon lands or property therein belonging to or which may hereafter be acquired by the United States or reserved for its use; but nothing herein, or in the ordinance herein provided for, shall preclude the said state from taxing, as other lands and other property are taxed, any lands and other property outside of an Indian reservation owned or held by any Indian, save and except such lands as have been granted or acquired as aforesaid or as may be granted or confirmed to any Indian or Indians under any act of congress, but said ordi[n]ance shall provide that all such lands shall be exempt from taxation by said state so long and to such extent as congress has prescribed or may hereafter prescribe. * * *

"Eighth. That whenever hereafter any of the lands contained within Indian reservations or allotments in said proposed state shall be allotted, sold, reserved, or otherwise disposed of, they shall be subject for a period of twenty-five years after such allotment, sale, reservation, or other disposal to all the laws of the United States prohibiting the introduction of liquor into the Indian country; and the terms 'Indian' and 'Indian country' shall include the Pueblo Indians of New Mexico and the lands now owned or occupied by them."

The people of the State of New Mexico fulfilled these conditions of the Enabling Act by adopting them as a part of the constitution. See State Constitution, Art. XXI, §§ 1, 2 and 8.

Turning to statutory law, we find that at an early date our territorial legislature created all Pueblo Indian villages bodies

corporate, having perpetual succession, with the right to sue and be sued "in any court of law or equity", etc. L.1865, c. 66 (1929 Comp., § 69-101). By L.1865, c. 21, §§ 1 and 2, the territorial legislature, subjected Indians to liability under the criminal and civil laws of the territory for felonies and misdemeanors committed beyond the limits of a reservation and laid the duty upon the court imposing sentence in any such case to notify the agent of the tribe of which such Indian was a member. L.1889, c. 140, enacted in territorial days, provided that all Indians committing named crimes against the person or property of another Indian, "or other person", viz., murder, manslaughter, rape, assault with intent to kill, arson, burglary and larceny, within or without an Indian reservation, should be subject to the laws of the territory, to be tried therefor in the same courts, in the same manner and subject to the same penalties as other persons charged with the commission of crimes, concluding with this language: "And the said courts are hereby given jurisdiction in all such cases". These old territorial laws have never been expressly repealed and are still to be found in the current compilation as 1929 Comp., §§ 69-107 and 69-109, both inclusive.

Section 69-107 is an exact counterpart of the Act of March 3, 1885, Ch. 341, § 9, 23 St. at L. 385, 18 U.S.C.A. § 548, except that the concluding portion of the act (section 9) made it applicable to states as well as territories, where any state contained an Indian reservation within its exterior boundaries.

We do not pause here to consider the extent to which these territorial acts survived the constitution nor the effect upon them of such cases as United States v. Sandoval, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107, and United States v. Chavez, 290 U.S. 357, 54 S.Ct. 217, 78 L.Ed. 360, nor the change, if any, wrought in them after statehood by the operation of an earlier federal statute, viz., R.S. § 2145; U.S.C.A., Title 25, § 217. It is enough to demonstrate that prior to statehood, at least, and with full approbation and express authorization of the Congress, the territorial courts of New Mexico had full jurisdiction to try Indians for named offenses committed against an Indian or any other person within or without an Indian reservation. It thus throws some light upon the extent to which New Mexico territorial courts participated in dealing with the abstruse Indian problem.

The case of Wilbur's Estate v. Bingham, 8 Wash. 35, 35 P. 407, 408, 40 Am.St.Rep. 886, lends support to the conclusion that New Mexico Pueblo Indian lands are territorially within the state of New Mexico for venue purposes in favor of residents thereof in actions otherwise maintainable in state courts. The validity of a marriage arose incident to the distribution of an estate. A Swinamish Indian woman, Kitty, with her sons by a white man, one John T. Wilbur, proposed the respondent as administrator of the estate. The marriage with her, if

any existed, took place on the Swinamish reservation set apart for this tribe of Indians on Fidalgo Island, Skagit County, under a treaty with the United States. It was assumed that such marriage would have been perfectly good between two Indians. After the supposed marriage Wilbur, who had been a resident of the territory for some time, living on Government land which he had taken up a few miles from the reservation lines, took the Indian girl to his home and lived with her for nine years, several children being born to them. Kitty then left him and returned to the reservation and he soon thereafter married the appellant, who claimed to be his lawful wife. The marriage with the Indian woman was held invalid by the Washington Supreme Court on the ground that marriage between Whites and Indians at that time was prohibited, although as already stated, such a marriage would have been valid, if contracted between Indians according to their customs and laws. Among other things, the court said: "It has always been conceded that congress had the right, when a new territory was organized, to exclude from its jurisdiction any lands embraced within the territorial limits, for any reason which it saw fit. More frequently than in any other cases, this exclusion was provided for as to lands embraced in Indian reservations. But it has not been by any means universal that either the civil or the criminal laws of a territory have been without force within the boundaries of an Indian reservation; and whether they have had such force or not has depended upon the acts of congress concerning the territories and public lands, and the treaties with various tribes providing for reservations."

The court then discusses the case of Harkness v. Hyde, 98 U.S. 476, 25 L.Ed. 237, and continues: "But in Langford v. Monteith, 102 U.S. 145 [26 L.Ed. 53], the court acknowledged having made a mistake in the former case, in finding the existence in the treaty of the clause mentioned, and held that where no such clause, or language equivalent to it, was found in a treaty with Idaho Indians, the lands held by them were a part of the territory, and subject to its jurisdiction, so that its process could run therein, although the Indians themselves might be exempt from such jurisdiction. In United States v. McBratney, 104 U.S. 621 [26 L.Ed. 869], held, that the United States circuit court for the district of Colorado had no jurisdiction of a case of murder committed by one white man upon another within the Ute reservation, because the act of March 3, 1875, authorizing the admission of Colorado as a state, contained no exception of jurisdiction over the reservation, such as had been made in the treaty with the Indians, but that the state courts, alone, could try the accused for the offense. An examination of the organic act of Washington Territory shows only this in regard to Indians and their lands: 'Provided, that nothing in this act contained shall be construed to affect the authority of the government of the United States to make any regulations respecting the Indians of said ter-

ritory, their lands, property or other rights, by treaty, law or otherwise, which it would have been competent for the government to make if this act had never been passed.' 10 Stat. 172. No act amending or enlarging this proviso came into operation until 1875, when Rev.St.U.S. § 1839 [48 U.S.C.A. § 1451], was made applicable to all the territories. In the meantime the treaty with the Swinamish Indians was made, taking effect April 11, 1859. * * *

"This language, both of the organic act and of the treaty, was wholly different from that concerning the Idaho or Colorado Indians, and under Langford v. Monteith and United States v. McBratney, supra, must be taken to have left the reservation within, and a part of, the territory, for all legislative and judicial purposes not affecting the personal rights and the lands and other property of the Indians. Whether these could have been controlled by territorial statutes, we do not pretend to decide. But it must be, it seems to us, by every rule of jurisdiction, that when Wilbur went upon the reservation, even if he went there with the full purpose of·procuring Kitty to be his wife, the law of the territory met him there, in all its force, and prohibited him from making a legal marriage with her, under any forms or ceremonies whatever; and she, although an Indian and a mere child, was bound to know that the same prohibition attached to her. Therefore, the ·only attempt to constitute a marriage between them was void, and the fact that the prohibiting statute was repealed a short time after they commenced to live together, viz. in 1868, made their case no better, since all that appears in the record concerning them subsequently is that they cohabited, and cohabitation did not constitute a marriage. In re McLaughlin's Estate, 4 Wash. 570, 30 P. 651 [16 L.R.A. 699]."

We call particular attention to the fact that in legal effect the provision of the Organic Act of Washington in regard to Indians and their lands is substantially the same as that to be found in Section 2 of our Enabling Act, quoted supra.

See also In re Walker's Estate, 5 Ariz. 70, 46 P. 67, 69, holding void a marriage between a white man and an Indian woman celebrated on the Pima Indian reservation according to Indian customs and law by reason of a territorial statute prohibiting such marriages. The court thus gave effect to the statute throughout the territory of Arizona. The contention was made that the status of the reservation was akin to that of a foreign country. It was dismissed with this comment: "This doctrine is not tenable in a territory. There are not two sovereignties here, one for the power owning the reservation and one for the territory. There is only one sovereignty here, —that of the United States,—which delegates its power to the territory to legislate on all rightful subjects of legislation; and the legislative acts of the territory are operative in all parts of the territory, including Indian and all other executive or legislative reservations, ·unless expressly forbidden by·the congress of the United States.

If both of these parties had been Indians, the courts would recognize such relations as a marriage."

The Revised Statutes of the United States, § 1839, 48 U.S.C.A. § 1451, adopted in 1875 and common to all territories clearly recognizes that in some instances Indian reservations within a state or territory are to be considered a part of said state or territory and that in other instances they should not be so considered. This section reads: "Nothing in this Title [chapter] shall be construed to impair the rights of person or property pertaining to the Indians in any Territory, so long as such rights remain unextinguished by treaty between the United States and such Indians, or to include any Territory which, by treaty with any Indian tribe, is not, without the consent of such tribe, embraced within the territorial limits or jurisdiction of any State or Territory; but all such territory shall be excepted out of the boundaries, and constitute no part of any Territory now or hereafter organized until such tribe signifies its assent to the President to be embraced within a particular Territory."

■■ Unquestionably, the lands of the Pueblo Indians in New Mexico are to be considered "territorially" a part of the Territory (now State) of New Mexico. It is obvious from a reading of this section that only the lands of "Treaty Indians" were to be "excepted out of the boundaries, and constitute no part of any territory now or hereafter organized until such tribe signifies its assent to the President to be embraced with-

in a particular territory". It seems to us a logical sequitur to this statute that the lands of non-treaty Indians, as a matter of course, are to be deemed "embraced within the territorial limits or jurisdiction of any State or Territory" wherein such lands or reservations are situate, unless excepted by congressional legislation.

This view of the status of such lands for jurisdictional purposes is borne out by the decision of the United States Supreme Court in United States v. Candelaria, 271 U.S. 432, 46 S.Ct. 561, 564, 70 L.Ed. 1023. In that case an opinion written by Mr. Justice Van Devanter for the court, in answer to certified questions from the U. S. Circuit Court of Appeals for this circuit, holds that the United States as guardian of the Pueblo Indians is not bound by decree of the state court against a Pueblo seeking to quiet title to lands alleged to belong to it, where the United States was not a party to the suit, nor represented by an attorney having authority to represent it. It holds, nevertheless, that the United States as such guardian is bound by a decree against Pueblo Indians affecting title to their lands if the Indians were represented by an attorney employed by the United States to look after the interests of the Indians. The court said: "Coming to the second question, we eliminate so much of it as refers to a possible disregard of a survey made by the United States, for that would have no bearing on the court's jurisdiction or the binding effect of the judgment or decree, but would present only a question of whether error was committed in

the course of exercising jurisdiction. With that eliminated, our answer to the question is that the state court had jurisdiction to entertain the suit and proceed to judgment or decree. Whether the outcome would be conclusive on the United States is sufficiently shown by our answer to the first question."

People ex rel. Charles v. Blackchief, D. C., 8 F.Supp. 295, in line with the Candelaria case, although not citing it, holds that an action for partition of lands within an Indian reservation in New York may be prosecuted in the courts of such state and the parties' rights determined under applicable laws thereof.

█ It seems to be generally held that where the federal government has failed to take action relative to rights of tribal Indians to litigate questions between themselves, the federal court will not assume jurisdiction and state jurisdiction is recognized. Rice v. Maybee, D.C., 2 F.Supp. 669; Plummer v. Hubbard, 207 App.Div. 29, 201 N.Y.S. 747; Lyons v. Lyons, 149 Misc. 723, 268 N.Y.S. 84; Red Hawk v. Joines, 129 Or. 620, 278 P. 572. The court, in Plummer v. Hubbard, supra [207 App. Div. 29, 201 N.Y.S. 749], calls attention to the fact that the New York Indians known as The Six Nations "sustain a relation toward this state and its government different from that sustained by other Indian tribes or nations toward other states". Nevertheless, the pronouncements of the New York courts on the proposition just stated are in harmony with the decisions of the federal courts. The opinion in this case gives an extensive review of the changing method of dealing with the Indian problem in the state of New York in view of federal guardianship over the Indians.

In Luigi Marre Land & Cattle Company v. Roses, 139 Cal.App. 474, 34 P.2d 195, 196, the United States District Attorney sought to intervene and set aside a judgment rendered against certain California Indians in a suit to quiet title to 6,053 acres of land in San Luis Obispo County, title to which was deraigned under a patent issued by the government, and to assert their title to a small area of approximately five acres. The ground upon which he moved was that the particular defendants were California Indians and "wards of the federal government, incompetent in law to take care of their own affairs" etc. Although holding that the proof was insufficient to show that they were such Indians, the court had this to say regarding their contention: "But even assuming that defendants are Indians, such fact alone did not render them legally incompetent to take care of their own affairs, or exempt them from the operation of state laws or the jurisdiction of state courts as to matters respecting their civil rights, nor does the case of Cramer v. United States, supra [261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622], upon which defendants rely, so hold".

In Red Hawk v. Joines, supra, the Supreme Court of Oregon said [129 Or. 620, 278 P. 577]: "It does not follow, because

the authority of the federal government over the Indians and the Indian country is supreme, that the state and territorial government have no jurisdiction whatever over them, and over Indian reservations. In the absence of provisions to the contrary, the lands embraced therein occupied by Indian tribes are a part of the state territory, and subject to its jurisdiction, except so far as concern the government and protection of the Indians themselves, and for purposes relating to treaties and agreements between the United States and Indians, in which respects the jurisdiction of the United States is exclusive. Wagoner v. Evans, 170 U.S. 588, 18 S.Ct. 730, 42 L.Ed. 1154; Thomas v. Gay, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740; Draper v. United States, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419; Utah & Northern Railway Co. v. Fisher, 116 U.S. 28, 6 S.Ct. 246, 29 L.Ed. 542."

We had occasion recently to consider the right of an Indian to maintain a certain action in our state courts. Trujillo v. Prince, 42 N.M. 337, 78 P.2d 145, 148. We sustained the right of a Nambe Pueblo Indian, residing on the Pueblo lands, to sue as administrator of another Nambe Indian for death by wrongful act claimed to have been committed off the reservation. In the course of the opinion we took notice "that the view, entertained in the earlier days, that the Indians were a distinct and separate people, has been somewhat modified". We observed that, as to matters of local concern, at least, the power of congress over Indians is not deemed exclusive and that "as to such matters the silence of Congress discloses no objection to the operation of state laws". This proposition is affirmed in Rice v. Maybee, Plummer v. Hubbard, Lyons v. Lyons, and other cases, cited supra.

In this connection, we refer to 14 R.C. L. 212, § 15 under the subject "Indians". It is there asserted that an Indian may maintain an action in a state court to enforce his right to the enjoyment of property, real or personal, or for personal injuries since the courts of a state as a rule are open to persons irrespective of race, color or citizenship. It is also said that in bringing a suit in a state court an Indian is subject to the same laws relating to the prosecution of suits which govern any citizen of the state, including the statute of limitations. So, in Trujillo v. Prince, notwithstanding congress had enacted no Death by Wrongful Act Statute for protection of the Indian, the field thus being one not covered by federal legislation, we permitted a Nambe Indian as personal representative of a deceased member of his tribe, to avail himself of the state remedy. See Rubideaux v. Vallie, 12 Kan. 28; Bem-Way-Bin-Ness v. Eshelby, 87 Minn. 108, 91 N.W. 291.

Is there any more reason to deny them access to our state courts for severing the ties of a hopeless marriage? We think not. Congress has remained silent upon the subject of divorce and provides no remedy. It is not asserted either in pleading

or proof that Pueblo customs and laws provide a remedy in divorce. As shown, bona fide residence in the Pueblo meets the test of our venue statutes. Its continuance for one year meets the requirement of our divorce statutes on residence. The Pueblo lands are New Mexico "territory" for purposes of venue and residence in actions otherwise maintainable in our state courts. Whether the same rule would obtain as to the reservations of other than Pueblo Indians, i. e., Treaty Indians, located within the exterior boundaries of New Mexico, we need not decide. The question, when presented, will have to be resolved in the light of congressional legislation and treaty provisions. The Pueblo Indians are not Treaty Indians.

█ We conclude that the district court of Sandoval County had jurisdiction of the parties and of the subject matter and properly entertained jurisdiction of the cause. This brings us to a consideration of the case on its merits.

The chief claim of error in the trial is that defendant was permitted to show justification for the separation without having specially pleaded it. The complaint charged abandonment which was met by a general denial only. And, yet, the defendant and other witnesses gave testimony which, if believed, abundantly established that the claimed abandonment was involuntary; that plaintiff kicked and beat the defendant and on one occasion dragged her through the plaza of the Pueblo of Santo Domingo, ordering her out of the house and warning that he would kill her if she ever returned.

██ It might be a sufficient answer to this claim of error to point out that defendant herself testified, without objection, that she left plaintiff because he mistreated and threatened her. When she related: "He kicks me around and hits me with sticks, or anything he can get hold of," it drew no protest from plaintiff nor did he move to strike. It was only later and when other witnesses were tendered whose testimony presaged greater detail concerning the mistreatment, that plaintiff, for the first time, objected "on the ground that such constitutes an affirmative defense, and is not expressly pleaded". The objection was overruled by the trial judge who in explaining his ruling leaves little to be said in support of its correctness: "It will be admitted for the purpose of contradicting the allegation of abandonment; that is, upon the theory that it was not an abandonment but forcible driving away."

"Desertion or abandonment consists in the *voluntary* separation of one spouse from the other for the prescribed time without the latter's consent, *without justification,* and with the intention of not returning." (Emphasis ours.) 19 C.J. 56, § 109, under topic "Divorce".

█ It is argued under another claim of error that "recrimination is not a defense to divorce in this state". But it is, unless

the court wishes to overrule Chavez v. Chavez, 39 N.M. 480, 50 P.2d 264, 101 A. L.R. 635, and it is not now so disposed. Anyway, under the facts of this case, it is a misnomer to speak of defendant's proof on justification as "recrimination".

It is next asserted and argued as a ground for reversal that upon uncontradicted proof of abandonment, the court is without discretion to deny the divorce. This may be accepted as a perfect syllogism and still it does not aid the plaintiff. Here, there was no abandonment as the trial court viewed the matter; rather, a forcible expulsion of defendant from her home with a threat by plaintiff that he would kill her if she returned.

Neither are we persuaded that defendant's rejection of offers of reconciliation after the separation constituted a "new abandonment" as contended by plaintiff. The defendant was not compelled to risk death or great bodily harm on the faith of a promise previously broken. The last was only one of several prior separations, apparently always followed by a reconciliation, marking the turbulent married life of these parties.

The judgment of the trial court will be affirmed and it is so ordered.

BICKLEY, C. J., and BRICE and ZINN, JJ., concur.

MABRY, J., having tried the case below, did not participate.