## SAMUEL J. T. SMITH

*vs.*

## LUKE K. HACKETT.

*Elective franchise*: *male citizens' right to vote in ward or dis-
trict of residence; effect of precinct limitations.   Election
laws*: *Code, Article* 33, *section* 12; *polling places;
should be within precinct.   Duty of Supervisors*:
*directory and mandatory provisions of law.
Clerks and Judges of Elections*: *should
be sworn; effect of omission to
swear them.*

Under the State Constitution, every male citizen of the United
States, having the prescribed qualifications of age and resi-
dence, is entitled to vote in the election district in which he
resides.                                                    p. 76

The right to vote is not further restricted by the organic law
limiting it to the precinct of his domicile, should the district be
so subdivided.                                               p. 77

While it is the intent of the Election Law, section 12 of
Article 33 of the Code, that the voting place for a precinct
shall be located within its own territory, such provisions are, in
form, directions to the supervisors, and do not affect the voting
qualifications of voters.                               pp. 75-76-77

While the act of supervisors in locating a polling place for a
precinct beyond the division lines of the precinct is a violation
of the Election Law, it does not affect the right of the legal
voters of the precinct to there cast their votes.           p. 76

For unsworn persons to act in the places of election clerks or
judges, during their temporary absence, is irregular, but does
not invalidate the votes cast, in the absence of proof of miscon-
duct, or that such persons failed in their duties.          p. 79

The laws relating to the conduct of elections are directory; and a failure on the part of officials to observe the provisions will not invalidate the election, when no doubt is thereby cast upon the result and no rights have been prejudiced.　　p. 80

*Decided May 31st, 1916.*

Appeal from the Circuit Court for Dorchester County. (PATTISON, C. J., and JONES and STANFORD, JJ.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Isaac Lobe Straus* (with whom were *Clement Sulivane* and *V. Calvin Trice* on the brief), for the appellant.

*William L. Marbury* (with whom were *William N. Andrews* and *William L. Rawls* on the brief), for the appellee.

URNER, J., delivered the opinion of the Court.

The appellant and appellee were candidates of the democratic and republican parties, respectively, for the office of county commissioner of Dorchester County at the last general election. Upon the certified returns the appellee was elected by a plurality of twenty-seven votes. In this proceeding the appellant disputes the declared result and asserts that he in fact received a larger number of valid votes than the appellee, and was therefore duly elected.

The principal ground of the contest is that the polling place provided by the Supervisors of Election, for the second precinct of the seventh election district of the county, was located in the first precinct of that district, where the vote of the second precinct, which was largely in favor of the appellee, is said to have been cast and counted without legal right. The record shows that the second precinct of the seventh district includes a portion of the City of Cambridge and

a considerable section of outlying territory. The greater part of the voting population of the precinct resides in the city. It has been customary to hold the elections for the second precinct at some available place within its limits on or near Race street, a much traveled thoroughfare, whose center line forms one of the precinct boundaries. The polling place secured by the Supervisors for the use of the second precinct voters at the last election was a vacant storeroom on Race street, in the general locality where the elections had been previously held, but on the side of the street lying beyond the second and within the first precinct. This room was selected by the Board of Supervisors upon the recommendation of its republican president and his democratic associate, who made a joint investigation and were unable, as they testified, to find a convenient place in a suitable neighborhood on the second precinct side of Race street. The storeroom secured on the opposite side of the street was used for the accommodation of the precinct voters not only at the general election, but also on the occasions of the registration and primary election in the same year. No effort was made by any candidate or voter to prevent the use of the room for any of the purposes just mentioned, and it is not proven that the extent or result of the voting was affected by the fact that it was conducted a few yards beyond the precinct line.

The law, of course, intends that the polling place for each precinct shall be within its limits. By section 12 of Article 33 of the Code it is made the duty of the various boards of supervisors "to appoint the place of registration and also the polling place in each precinct of their county or city and to cause the same to be fitted up, warmed, lighted and cleaned. The places for registration and polling shall in all cases be upon the ground floor of a building, the entrance to which is from a highway or a public street * * * and shall be as near the center of the voting population of the precinct and as convenient to the greatest number of voters as is practicable. * * * If no suitable place is found, the supervisors

shall provide one." No discretion or authority is vested in
the boards of supervisors to go beyond the outlines of a pre-
cinct to secure a polling room for its voters. Their plain
and unqualified duty is to find and provide a suitable place
for the purpose within the precinct area. The performance
of this duty could undoubtedly be enforced by judicial pro-
cess upon allegation and proof that it was about to be dis-
regarded. This, however, is not the issue now presented.
The election has actually been held and the returns duly cer-
tified. The voters of the second precinct in fact resorted to
the only voting place provided for them, and the question
now raised is whether their votes should be rejected as illegal
because they were cast in a polling room located slightly
within the lines of another precinct of the same election dis-
trict.

It has been earnestly argued that such a result is unavoid-
able in view of the limitations imposed by the State Constitu-
tion upon the elective franchise. The constitutional qualifi-
cations of the right of suffrage are said to restrict its exer-
cise to the precinct in which the voter is registered. Upon
this theory it is urged that the votes cast at the late election
by the voters of the second precinct, at the place provided
outside its limits, were unlawful and nugatory.

The Constitution provides that every male citizen of the
United States having the prescribed qualifications of age and
residence in the State and county or city "shall be entitled
to vote in the ward or election district in which he resides."
Art. 1, sec. 1. The General Assembly is directed by section
5 of Article 1 to "provide by law for a uniform registration
of the names of all the voters in this State who possess the
qualifications prescribed in this article, which registration
shall be conclusive evidence to the judges of election of the
right of every person thus registered to vote at any election
thereafter held in this State," and it is declared that "no
person shall vote at any election * * * unless his name ap-
pears in the list of registered voters." The only condition
imposed by the Constitution as to the *place* where the right

to vote shall be exercised is that it must be in the election district of which the voter is a resident. The right is not further restricted by any requirement in the organic law that it shall be availed of only in the *precinct* in which the voter's domicile may be located, if the district should be thus subdivided. This Court has had occasion to emphasize the fact that the Constitution has conferred upon citizens of the State, otherwise qualified, the right to vote in the *election district* of their residence. *Kemp* v. *Owens,* 76 Md. 235; *Langhammer* v. *Munter,* 80 Md. 527.

As the right to vote can only be exercised by citizens who have become duly registered, and as the statute enacted by the General Assembly on the subject provides for registration by precincts, it necessarily follows that a voter has no opportunity to cast his ballot except at the polling place where the registry containing his name is being used for election purposes. While it is the intent of the satute, as already noted, that the voting place for a precinct shall be located within its own territory, the provisions to that effect are in the form of directions to the supervisors and have no reference to the voting qualifications of the individual citizen. The act of the supervisors in locating the polling room in this instance beyond the precinct division line was contrary to the purpose of the law, but the act of the voters of the second precinct in voting at the only place thus provided for them in the district of their residence was wholly within the right conferred upon them by the Constitution. The disputed ballots therefore were cast by voters who were fully qualified to participate in the election at the place selected for them by the supervisors. If their votes are to be rejected, it can not be on the ground of any want of legal right or competency on their part, but solely because of a mistake of judgment or misconception of duty on the part of the board of supervisors in reference to the proper location, in the district, of the precinct polling room in which the ballots were cast and counted. The Court below regarded this as an insufficient reason, upon the facts stated, for excluding the vote of the

precinct in question, and we can have no doubt as to the correctness of that conclusion. In the absence of any proven injury to any interest involved from the mere fact that the polling room for the precinct was at the location mentioned, we can find in that circumstance no just cause for invalidating the entire vote of the precinct and depriving the candidates for whom it was cast of its legitimate effect. This would be far too serious a result to recognize as a proper and necessary consequence of the particular breach of administrative duty under consideration.

The decisions cited by the appellant, in support of his contention that the vote of the precinct should be rejected, were concerned with cases in which the contested balloting occurred outside the district within which the voters were qualified to take part in the election. Among the cases of this class are: *Chase* v. *Miller,* 41 Pa. St. 403; *In re Contested Election of McNiell,* 111 Pa. St. 235; *Twichell* v. *Blodgett,* 13 Mich. 127; *Attorney General* v. *Holihan,* 29 Mich. 119; *Bourland* v. *Hildreth,* 26 Cal. 161; *Dyson* v. *Pope,* 71 Ga. 205. There are decisions, however, to the effect that even where the election is held beyond the limits of the district of the voters' residence, the result will not be rejected in the absence of fraud or other cause of injury. *People* v. *Carson,* 155 N. Y. 491; *Lane* v. *Otis,* 68 N. J. L. 656; *People* v. *Graham,* 267 Ill. 426; *Ex Parte Stein,* 61 Tex. Crim. Rep. 320; *Ralls* v. *Parish,* 151 S. W. 1092. The conclusion we have reached in the case at bar, upon the question we have discussed, is consistent with the rulings in the first class of the cases cited, and does not go to the extent of the decisions in the last group of cases referred to, because in this instance the polling place was located in the election district within which the voters whose ballots are disputed were constitutionally qualified to exercise the right of suffrage.

There were additional objections raised in the petition and proof in reference to the poll room provided for this precinct, on the ground of certain physical conditions which are said to have rendered the place unsuitable. It does not appear

that the freedom and fairness of the election were affected by the conditions complained of, and they afford no reason for a determination that the votes cast at this polling place should be discarded as illegal and void.

In the first precinct of the seventh district, during the counting of the ballots, as the testimony shows, a difference of one or two votes was occasionally discovered in the count of the two ballot clerks as they were marking the tally sheets, and their totals would then be made to agree. This is supposed by the appellant to have been an arbitrary and irregular process and sufficiently serious to justify a recount. The proof is that the correction of the tallies, when a discrepancy was found to exist, was so made as to properly represent the actual number of votes according to the judgment and belief of all the election officials. It is not shown that any correction had to be made in the counting of the votes cast for the appellant. The incidents to which he refers in this connection are wholly inadequate as a basis for his pending application.

In the first election district, and also in the first precinct of the seventh district, persons not duly sworn and qualified acted as substitute judges and clerks of election during the absence of some of the officials originally appointed. There is no suggestion that those who served in such capacities were guilty of any misconduct or failed to properly perform the duties of the positions which they assumed. While their service, as unsworn officers, was irregular, it was not fatal to the validity of the votes cast in the precincts in which they were so engaged. In 15 *Cyc.* 313, 373, a number of cases are cited to the propositions that the omission of election officers to take the prescribed oath will not invalidate the voting which they help to conduct, and that an election will not be vitiated by the temporary absence of one or more of the officials in charge. It was said in *Murphy* v. *Spokane,* 64 Wash. 686, that the failure of election officers to take the oath required by law, before entering upon their duties, had been uniformly held not "to defeat the election nor disturb

its results, such officers, though unsworn, being held to be *de facto,* if not *de jure,* officers." The general rule is stated in *Carr* v. *Hyattsville,* 115 Md. 549, that provisions of the law relating to the method of conducting elections are directory, and a failure on the part of the officials to observe the requirements governing their procedure will not invalidate the election when no doubt is thereby cast upon the verity of the result and no rights have been prejudiced.

Another irregularity in the course of the election in the first district consisted in the fact that the appellee, and his son, who were present during the counting of the votes, passed some of the ballots to one or more of the officials, at their request, in order to facilitate their work to that extent. This should not have been proposed or permitted, but the proof negatives the idea that it involved any interference whatever with the ascertainment and recording of the true result of the voting.

In the sixth district, where the election was held in a room of considerable size, there were from 125 to 150 persons present when the ballots were being counted. The evidence does not show that their presence affected in the slightest degree the accuracy of the count or of the returns.

About twenty democratic and nine republican ballots were rejected by the election officials in the eighth district because they contained punctures which were considered to be identification marks within the prohibition of the statute. There was testimony tending to show that these perforations may have resulted from the marking of the ballots on one of the wooden voting shelves which had an uneven surface. The judges of election, however, all agreed that the ballots were illegally marked for identification purposes and should therefore be rejected. This unanimous conclusion was reached by the election officers upon inspection of the ballots and with full knowledge of all the pertinent facts. Not having the means of information which they possessed, we are not able to say that their decision was erroneous. But if all the punctured ballots had been counted, the resulting net gain in

the appellant's vote would not have overcome the appellee's certified plurality. The rejection of these ballots therefore is not a sufficient ground upon which a recount may be demanded.

One of the election officers in the first district, having learned that a contest was in contemplation, told the appellant, and two other democratic candidates, that on the night of the election, while he was calling out the votes to be tallied, he announced more votes for them than they had actually received. The officer in question admitted, as a witness in the case, that he made such a statement, and testified that it was not true. There is no proof that there was any basis in fact for such a representation. But whether it was true or false, the appellant can find in it no valid cause of complaint. If it was true, he has been credited with more votes than he was entitled to, and if it was false, he has sustained no loss. In neither event can this statement aid his effort to prove that he has been so vitally prejudiced in his rights as a candidate that a recount of the ballots should properly be ordered.

In holding that the various irregularities we have noticed in the conduct of the election, in the districts and precincts mentioned, were not sufficiently serious to justify a recanvass, we must not be understood as giving them any sanction. The provisions of law as to the duties and procedure of the election officers are plain and positive and should be strictly observed in every detail in order that no possible question may arise as to the fairness of an election or as to the accuracy of its results as officially declared.

As we concur in the view adopted by the Court below, we will affirm its order dismissing the petition.

*Order affirmed, with costs.*