197 P.2d 884

**ARLEDGE v. MABRY, Governor, et al.**

**No. 5144.**

Supreme Court of New Mexico.

Sept. 21, 1948.

Rehearing Denied Sept. 27, 1948.

A. T. Hannett, H. O. Waggoner, and Stanley W. P. Miller, all of Albuquerque, Robert W. Ward, of Lovington, for informant.

C. C. McCulloh, Atty. Gen., for respondents.

Adams & Chase, Martin A. Threet, and Harry O. Morris, all of Albuquerque, for D. A. (Danny) Macpherson, real party in interest.

D. A. Macpherson, of Albuquerque, pro se.

Everett M. Grantham, U. S. Atty., of Santa Fe, amicus curiae.

SADLER, Justice.

The primary question for decision is whether that portion of Precinct No. 17 in Sandoval County, acquired by the United States through condemnation proceedings

and incorporated into what is popularly known as the Los Alamos Project, is "in New Mexico" within the true meaning of Art. 7, § 1 of the New Mexico Constitution defining the qualifications of an elector entitled to vote at all elections for public officers. Incidentally, the right to vote of residents of other portions of the lands comprising the Los Alamos Project lying within Precinct No. 17, as affected by the fact of acquisition for its use from areas of the public domain, will be discussed and determined. And, finally, but for determination only in the event of a holding that the portion of said precinct so acquired through condemnation is not "in New Mexico" within contemplation of the constitutional provision mentioned, whether conduct of an election at which all polling places for the precinct are located in the condemned area, invalidates such election.

The questions arise out of a contest between R. F. Deacon Arledge, the Informant, and D. A. "Danny" Macpherson, his opponent, rival candidates in the primary election of June 8, 1948, for the democratic nomination for the office of Judge of the District Court of the Second Judicial District, Division No. 2. The Informant, appearing upon the face of the returns to have received the larger number of votes, was declared to be the nominee by State Canvassing Board and a certificate of nomination was duly issued to him. Thereafter, both candidates having requested a recount of the ballots in certain designated precincts and voting divisions of the three counties comprising the Second Judicial District, the vote received by the candidates mentioned, after recount of the votes, was retabulated by the respective Boards of County Commissioners, acting as county canvassing boards. The result disclosed that Informant's previous majority was overcome and a majority of 78 votes accumulated in favor of his opponent.

The corrected result of the primary election for democratic nomination for the office mentioned having been certified to the State Canvassing Board composed of the Governor, Chief Justice and Secretary of State, the officers named were about to meet as the State Canvassing Board, recanvass the amended returns for the nomination involved, and as Informant had good reason to believe, cancel Informant's certificate of nomination and issue another one to his rival candidate. Thereupon, the Informant applied to this Court for a writ of mandamus against the above named state officers, composing in an ex-officio capacity the State Canvassing Board, as respondents, commanding them to recanvass the returns in the office of the Secretary of State for the nomination mentioned, employing the amended returns resulting from the recount, but omitting and excluding therefrom returns from all voting divisions in Precinct No. 17 of Sandoval County. It is argeed that if the returns

from said precinct be ignored, the Informant is rightfully entitled to the certificate of nomination which he now holds. We authorized issuance of an alternative writ and now the matter is before us on the writ and answer with all facts essential to a decision covered by written stipulation filed herein.

It could only result in confusion to endeavor to detail in this opinion the various steps by which the United States acquired title to the lands embraced in Precinct No. 17 of Sandoval County, New Mexico. Hence, only the basic, ultimate facts touching this phase of the case and deemed essential to our decision will be stated. Suffice it to say that the Los Alamos Project of the Atomic Energy Commission is a tract of land, located partly in Sandoval County and partly in Santa Fe County, New Mexico, containing approximately 68,991.30 acres. Title to all this land is held by the United States of America with custody and use of the land in United States Atomic Energy Commission, an agency of the government. Precinct No. 17 (Los Alamos) Sandoval County, New Mexico, is a tract of land within the Los Alamos Project of the Atomic Energy Commission. It contains approximately 580.29 acres and lies wholly within Sandoval County, New Mexico. Title to different parcels of this tract was acquired by the government in two different ways.

Title to an area comprising 172.90 acres within Precinct No. 17 was acquired by the United States, together with a large additional quantity of land, from Mexico in 1848 under the terms of the Treaty of Guadalupe Hidalgo, 9 Stat. 922. It thus became a part of the public domain and enjoyed that character when on January 6, 1912, 37 Stat. 1723, New Mexico was admitted into the Union as a sovereign state. It came immediately under administration of the Department of the Interior following its acquisition and in 1905 this tract, along with other lands, was established as a forest reserve. Subsequently, in 1905 the administration of forest reserves was transferred by congress to the Department of Agriculture. This tract remained as a part of the national forest reserves, finally being incorporated into and becoming a part of Santa Fe National Forest. It was such when the custody, use and occupancy of this and other lands, by agreement between governmental departments passed, first, to Corps of Engineers of United States Army and, finally, by Executive Order No. 9816 of the President, 42 U.S.C.A. § 1802 note, under authority of the Atomic Energy Act of 1946, Public Law 585, 79th Congress, 42 U.S.C.A. § 1801 et seq., into the custody, management and control of the Atomic Energy Commission. So stood the title, control and management of said tract of 172.90 acres at all times material to this case.

The United States acquired title to the remaining 407.39 acres of Precinct No. 17 on June 18, 1943, through condemnation proceedings instituted against Los Alamos Ranch School, Inc., a corporation, in the United States District Court for the District of New Mexico. These lands, along with others included in the same condemnation proceeding, were acquired by the United States on behalf of the War Department and devoted immediately to the use and assigned to the custody of Manhattan District Corps of Engineers of the United States Army. Thereafter on December 31, 1946, and by the same Executive Order No. 9816, mentioned above, the President of the United States under authority of Atomic Energy Act of 1946, transferred this 407.39 acres, along with all other property, real or personal, owned or in the possession, custody or control of the Manhattan Engineer District, War Department, to the Atomic Energy Commission. Such was status of the title, control and management of said tract of 407.39 acres at all times material to this proceeding.

It having been provided by § 355, Rev. Stat., as amended by the Act of February 1, 1940, 54 Stat. 19, and by the act of October 9, 1940, 54 Stat. 1083, 40 U.S.C.A. § 255, in effect, that unless and until the United States has accepted jurisdiction over lands acquired or in which any interest shall have been acquired after February 1, 1940, it shall be conclusively presumed that no such jurisdiction has been accepted, the Secretary of War under date of November 19, 1943, by letter addressed to Honorable John J. Dempsey, then Governor of New Mexico, at Santa Fe, gave notice that the United States was accepting and thereby did accept exclusive jurisdiction over all lands acquired by it for military purposes within the state of New Mexico, title to which had theretofore vested in the United States, and over which exclusive jurisdiction had not theretofore been obtained. This letter from the Secretary of War further gave notice that:

"Exclusive jurisdiction is also accepted over all lands reserved from the public domain for military purposes, over which such jurisdiction has not heretofore been obtained."

Subsequently, under date of August 21, 1944, the Secretary of War addressed another letter to the Honorable John J. Dempsey, Governor of New Mexico, at Santa Fe, referring to his letter of November 19, 1943, and to another letter of identical language from the Secretary to Governor Dempsey dated August 8, 1944, the letter of August 21st purporting to give a list of all military reservations over which exclusive federal jurisdiction had been accepted, "comprising lands acquired and/or reserved from the public domain as of August 8, 1944." Included in the list submitted

was "Los Alamos Demolition Range" in Sandoval County, which embraces the lands of Precinct No. 17 in said county.

It was later discovered by the Secretary of War that he had made an error in compiling the list of lands over which United States accepted and claimed exclusive jurisdiction. Accordingly, under date of September 7, 1944, he addressed another letter to the Honorable John J. Dempsey, Governor of New Mexico, at Santa Fe, reading:

"Reference is made to my letter of August 21, 1944, furnishing a list of military reservations in the State of New Mexico comprising lands acquired or reserved from the public domain as of August 8, 1944.

"Exclusive jurisdiction has been obtained over all land in the State of New Mexico acquired in fee simple by the United States for military purposes prior to August 8, 1944, by purchase, condemnation, or donation; also over all lands set apart from the public domain for the Fort Wingate Military Reservation and the Fort Bliss Target Range.

"It has been discovered that in compiling the list furnished with the letter of August 21, 1944, certain military reservations, in addition to Fort Wingate and Fort Bliss Target Range, were included which consisted entirely of public domain land. Since the laws of the State of New Mexico do not cede exclusive jurisdiction over land reserved from the public domain for military purposes, excepting lands so reserved for the Fort Wingate Military Reservation and the Fort Bliss Target Range, it was not the intention of this Department to include in the list such reservations. Therefore, in order to correct your records, there has been prepared and is inclosed a new list of military reservations in the State of New Mexico which are wholly or in part under the exclusive jurisdiction of the United States.

"It is regretted that the previous list furnished you included lands over which exclusive jurisdiction had not been obtained."

Each of the ballot boxes in use at said primary election on June 8, 1948, in Precinct No. 17 of Sandoval County, contained ballots cast by persons who resided within the National Forest Area (public domain lands) within said precinct. They also contained ballots cast by persons who resided on lands within the Condemned Area within the precinct, some of whom were residents of New Mexico, residing on land now within such precinct, prior to the time title to the Condemned Area within such precinct was acquired by the United States and prior to the date that the letters from the Secretary of War to the Governor of New Mexico, above referred to, were written or received.

A portion of the lands contained in the Los Alamos Project, including part of Precinct No. 17, is devoted exclusively to scientific and technical purposes, being separated from the residential area and other parts of the project. No persons reside on the area so devoted to scientific and technical purposes and none of the voting places in the primary election were located there. All of the polling places employed in the primary election of June 8, 1948, were located within the residential and business areas of the town of Los Alamos, upon lands acquired by condemnation, as aforesaid.

The condemned area within Precinct No. 17 was acquired by the U. S. Government for the United States Army in 1943 at a time when the United States was engaged in war. At the time of said election and at the present time, it is operated by the Atomic Energy Commission for the purpose of providing community and administrative facilities in connection with operation of the project designated as "Los Alamos Project," which in turn is operated for one or more of the purposes set forth in Chapter 14, Title 42, §§ 1801 to 1819 inclusive, U.S.C.A., and Executive Order No. 9816 signed by the President of the United States of America dated December 31, 1946.

Precinct No. 17 (Los Alamos), Sandoval County, is an unincorporated community of approximately 8000 inhabitants located partly upon lands acquired by the United States by condemnation from private owners, and partly upon lands previously within a national forest. Certain community functions frequently performed by municipal corporations, such as fire protection, electric, water and gas utility service, sewage disposal, garbage collection, and other matters, are at present conducted by the Zia Company, a corporation chartered under the laws of New Mexico, having its principal place of business at Los Alamos, and operating under a cost plus fixed fee contract with the United States, executed by and under the administration of the manager's office of Santa Fe Directed Operations, U. S. Atomic Energy Commission.

This community, known as Los Alamos and as Precinct No. 17, Sandoval County, is within a larger area, all of which is guarded by armed guards in uniform employed by the Atomic Energy Commission, and for which passes are required to enter. Within this larger area there are other restricted areas for which an additional pass is required to enter. Passes are granted to persons having business within said precinct, or desiring to visit persons who reside there. The Government does not interfere (except insofar as is necessary for security reasons and is consistent with its position as land owner) with the conduct in the community, either by persons who reside within Precinct No. 17 or

those who do not, of such matters as the following: sale of insurance, sale and distribution of newspapers, and the conducting of political campaigns.

Persons residing in Precinct No. 17, including those who reside on the condemned area therein and who voted in the Democratic primary election on June 8, 1948, have at all times material hereto paid or borne the incidence of New Mexico income taxes, sales taxes, gasoline and tobacco taxes; they have obtained New Mexico license plates for their private automobiles and resident hunting and fishing licenses. A deputy registrar of the Bureau of Vital Statistics has an office within the precinct and reports births and deaths therein to the New Mexico Bureau of Vital Statistics; they obtain marriage licenses from the County Clerk of Sandoval County for marriages conducted in said Precinct No. 17. A United States Commissioner holds court outside of the precinct in a building located immediately outside of the main gate of the project and tries cases involving federal offenses committed within the precinct. This commissioner does not attempt to enforce any state laws within the precinct. So far as the parties to this stipulation are informed, there have been no prosecutions by state officials for violations of state laws committed within the precinct, nor do the parties hereto have knowledge of the occurrence of any such violations.

Concessionaires operating various business enterprises within Precinct No. 17 and upon the condemned area therein, returned for assessment, and the county assessor of Sandoval County assessed for taxation during the year 1948, their personal property used in connection with said businesses.

With the foregoing facts in mind, we seek first an answer to the primary question propounded at the outset of this opinion, namely, whether that portion of Precinct No. 17 in Sandoval County, acquired by the United States through condemnation proceedings and incorporated into the Los Alamos Project, is "in New Mexico" within the meaning of Art. 7, § 1, of the New Mexico constitution defining the qualifications of an elector entitled to vote at all elections for public officers. If we could give an affirmative answer to this primary question, answers to the other two which were put along with this one, would follow as a matter of course. However, we may not so easily resolve our labors. Controlling precedents, affording unanimity of judicial opinion seldom encountered, convince us that a negative answer to the primary question submitted is called for.

There are three principal methods by which the United States may acquire land within a state. First, the method known as the constitutional method, as provided by Clause 17, § 8, Art. 1, of the federal constitution. Second, by purchase

without obtaining the consent of the state. Third, where the land acquired by the government was the property of the state, such acquisition being by a cession by the state to the federal government in the nature of a gift. Fort Leavenworth R. R. Co. v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264; Lowe v. Lowe, 150 Md. 592, 133 A. 729, 46 A.L.R. 983. Different consequences follow acquisition under the three means permitted. When acquisition is made in the constitutional method, ordinarily exclusive jurisdiction for all purposes over the lands acquired attaches in favor of the federal government, with the single exception of the right in the state to serve civil and criminal process through its officers on such land relating to acts and offenses outside such land. This concurrent right in the state usually is recited in acts of cession passed by the legislature of the state in which the land lies. We have such an act in this state which will be referred to presently.

The constitutional provision mentioned is U.S.Const.Art. 1, § 8, cl. 17, giving congress power, among other things:

"To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings."

The New Mexico statute whereby consent was given to the United States to acquire any land in New Mexico under the clause of the federal constitution quoted above for sites for arsenals and other purposes was enacted in 1912 as L.1912, c. 47, the portions thereof material to this controversy, reading:

"The consent of the state of New Mexico is hereby given, in accordance with the seventeenth clause, eighth section, of the first article of the Constitution of the United States to the acquisition by the United States, by purchase, condemnation, or otherwise, of any land in this state required for sites for custom-houses, court-houses, post-offices, arsenals, or other public buildings whatever, or for any other purposes of the government.

"Exclusive jurisdiction in and over any land so acquired by the United States shall be, and the same is hereby, ceded to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this state; but the jurisdiction so ceded shall continue no longer than the United States shall own such lands." 1941 Comp. §§ 8-202 and 8-203.

██ Although the United States constitution, in the clause quoted, mentions acquisition by purchase, it has long been settled that the same consequences attach from a jurisdictional standpoint where land is acquired through condemnation proceedings. Indeed, land so acquired is deemed to have been secured by purchase and the same consequences attach. Kohl v. United States, 91 U.S. 367, 23 L.Ed. 449; Hanson Lumber Co. v. United States, 261 U.S. 581, 43 S.Ct. 442, 67 L.Ed. 809; United States v. Becktold Co., 8 Cir., 129 F.2d 473; United States v. Beaty, D.C., 198 F. 284; United States v. 2.74 Acres of Land, D.C., 32 F.Supp. 55. Furthermore, the term "exclusive legislation" employed in said Clause 17 of the federal constitution is held to be synomymous with and to carry the same meaning as if the term "exclusive jurisdiction" had been employed. Fort Leavenworth R. R. Co. v. Lowe, supra; Surplus Trading Company v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091; James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318; Johnson v. Morrill, 20 Cal.2d 446, 126 P.2d 873.

In a variety of situations, other than that involving the right of residents of ceded land to exercise the elective franchise, both state and federal courts have held the jurisdiction of the United States to be full and complete, or as the selected word, "exclusive", implies. For instance,

in People v. Hillman, 246 N.Y. 467, 159 N.E. 400, it was held that an accused charged with a robbery alleged to have been committed on a road through the West Point Military Reservation was not subject to prosecution in the state courts. In Commonwealth v. King, 252 Ky. 699, 68 S.W.2d 45, a county court was denied jurisdiction to try a bank official charged with making false entries upon the books of a bank operating on the Ft. Knox Military Reservation. In Lowe v. Lowe, supra, the Supreme Court of Maryland held that the plaintiff in a divorce suit, the only claim to residence being the fact of domicile on a military reservation, could not meet the statutory requirement of residence in the state essential to maintaining his action.

In Standard Oil Co. v. People of State of California, 291 U.S. 242, 54 S.Ct. 381, 383, 78 L.Ed. 775, the court ruled that gasoline sold on the Presidio Military Reservation was not subject to tax. The court said:

"A state cannot legislate effectively concerning matters beyond her jurisdiction and within territory subject only to control by the United States."

In the case of Johnson v. Yellow Cab Transit Co., 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814, in perhaps the latest expression by the United States Supreme Court on the subject, it was held that seizure at

Oklahoma City, Oklahoma, by state enforcement officers of a shipment of liquor enroute from East St. Louis, Illinois, to Officers Club, as consignee, at Ft. Sill, Oklahoma, was illegal and its return to the carrier was ordered. The basic ground of decision was exclusive jurisdiction in the United States over Ft. Sill Military Reservation.

The foregoing citations represent cases where exclusive jurisdiction in the United States over lands acquired in the constitutional method within the borders of states was fully sustained in respect of acts done or attempted not involving exercise of the elective franchise. However, there are several precedents in the books where that issue was involved. Without exception, under circumstances similar to those here present, the courts have denied the claimed right upon the ground of want of residence within the state by the person asserting it. Sinks v. Reese, 19 Ohio St. 306, 2 Am.Rep. 397; In re Town of Highlands, Sup., 22 N.Y.S. 137; Opinion of the Justices 1 Metc. 580, 42 Mass. 580; McMahon v. Polk, 10 S.D. 296, 73 N.W. 77, 47 L.R.A. 830; State v. Willett, 117 Tenn. 334, 97 S.W. 299; Herken v. Glynn, 151 Kan. 855, 101 P.2d 946, on this point approved in the late case of Miller v. Hickory Groves School Board, 162 Kan 528, 178 P.2d 214; State ex rel. Parker v. Corcoran, 155 Kan. 714, 128 P.2d 999, 142 A.L.R. 423.

The status of lands over which the government of the United States, by cession from a state, has acquired exclusive jurisdiction, except for concurrent right to serve civil and criminal process in relation to offenses and causes of action originating outside such lands, is well stated by the courts in the following cases, to-wit: Collins v. Yosemite Park Co., 304 U.S. 518, 58 S.Ct. 1009, 82 L.Ed. 1502, and Yellowstone Park Transportation Co. v. Gallatin County, 9 Cir., 31 F.2d 644. In the Collins case, the court said [304 U.S. 518, 58 S.Ct. 1016]:

"Except as to this reserved jurisdiction, California 'put that area beyond the field of operation of her laws.'"

The United States Circuit Court of Appeals for the Ninth Circuit in Yellowstone Park Transportation Co. v. Gallatin County, supra [9 Cir. 31 F.2d 645], said:

"In other words, after the date of cession, *the ceded territory was as much without the jurisdiction of the state making the cession as was any other foreign territory,* except in so far as jurisdiction was expressly reserved. For this reason, the taxing laws of the state of Montana are wholly inoperative in that portion of the Yellowstone National Park within the territorial limits of the state." (Emphasis ours.)

And, in Consolidated Milk Producers for San Francisco v. Parker, 19 Cal.2d 815,

123 P.2d 440, 441, where the question was whether State Director of Agriculture had jurisdiction to regulate milk distribution on the Presidio Military Reservation, the court said:

"California ceded exclusive jurisdiction over the Presidio to the United States by Act of March 2, 1897 (Cal.Stats. 1897, page 51) reserving only the, right to execute civil and criminal processes therein. (Citations omitted). *The area thus became a federal territory* removed from jurisdiction of the state." (Emphasis ours.)

The same declaration occurs in some of the so called "vote cases" since, indeed, all rest their decisions on the hypothesis that the land on which residence is claimed is outside the state territorially, within contemplation of law, so far as intended by the constitutional requirement of residence as a condition of the right to vote. In the case of In re Town of Highlands, supra [22 N.Y.S. 139], the court said:

"We turn to the question of the right of these people to vote. That has been decided in numerous cases. In the case of Com. v. Clary, 8 Mass. 72, the supreme court of Massachusetts held that the people on the government property at Springfield had no right to vote, and the question also arose, and was decided, in a case reported in 1 Metc. 583, (Supp.)

* * * *So, as Judge Field says, there is a uniform current of authority from the beginning of the government down to the decision of this* (Ft. Leavenworth) *case in 1884,—all to the effect that this territory is not part of the state.* (Emphasis ours.) * * *

"We all know that the District of Columbia was ceded by the state of Maryland to the United States, and no resident of the District votes anywhere; and of course a resident on the West Point property occupies the same relation to the government and the state of New York as a resident of the District of Columbia does to the state of Maryland. He has no right to vote. The effect of this is to exclude from the right to vote persons who have no other qualifications as residents except a residence on the West Point property."

Counsel for respondents, and more especially Honorable Everett M. Grantham, United States Attorney for the District of New Mexico, appearing amicus curiae, would have us believe that the law as declared in the foregoing quotation represents an earlier and strict construction, since abandoned in favor of a new approach, stemming from a more liberal philosophy toward the jurisdictional question involved. We find nothing in the decisions to warrant this conclusion. Indeed, the latest cases on the subject, under

similar facts, adhere to the earlier precedents. See Herken v. Glynn, supra, decided by the Supreme Court of Kansas in 1940, and the still later case of Miller v. Hickory Groves School Board, supra, from the same court in 1942. We may add to these the decision of the United States Supreme Court in Johnson v. Yellow Cab Co., supra, in 1944, where under different facts, the same principle of exclusive jurisdiction in the federal government is reaffirmed.

It is argued by counsel, although neither persuasively nor too hopefully, that the condemned area, as a whole, is not a "site" within the meaning of our consent statute; that by use of the words "custom houses, court houses, postoffices, arsenals or other public buildings whatever," the legislature intended only building sites; and that in adding the phrase "or for any other purpose of the government," under the doctrine of ejusdem generis, it could only have had reference to other purposes of a similar nature to those previously mentioned.

■■ The argument hardly seems tenable in view of the obvious fact that our consent statute was adopted to afford cooperation on the part of the state with the federal government in acquiring lands for necessary governmental functions and purposes. Indeed, reference appears in the act, 1941 Comp. § 8-202 et seq., to U.S. Const. Art. 1, § 8, cl. 17, which itself does not employ the word "sites," but rather the word "places"—for forts, magazines, arsenals, etc. The second section of our act cedes exclusive jurisdiction over "any land" so acquired, yet in reserving jurisdiction to serve process relates the reservation to "such sites," disclosing that the words "sites" and "land" were to have a synonymous meaning, that meaning to embrace all lands acquired for the purposes stated. Certainly, such has been the meaning given it in all cases brought before the courts and that, too, without seeming question. To give it the narrow, restricted meaning urged by counsel would practically nullify the broad purposes reflected in clause 17, § 8, Art. 1 of the federal constitution and our consent statute enacted in pursuance of same.

■ Counsel argue at some length over status of the condemned lands as an "arsenal." We have no difficulty in classifying them as such in view of their acquisition for the United States Army in 1943 while we were at war and general knowlelge on the extent to which, since acquisition, they have been devoted, among other things, to experimentation with fissionable materials and the manufacture and assembly of the most destructive agency the mind of man has ever succeeded in devising—the atom bomb.

We are forced to the conclusion that residence on the condemned area of Los Alamos Project will not meet the constitutional requirement of "residence" for voting purposes.

Having reached the conclusion announced as to the condemned area or "deeded land" as a situs of residence for voting purposes in the constitutional sense, we proceed to determine the status of public domain lands within Los Alamos Project —172.90 acres in extent—within the precinct as a situs of residence for such purposes. In this connection it will be recalled that, although the Secretary of War at one time asserted and claimed "exclusive jurisdiction" of such lands along with condemned lands, nevertheless, by declaration contained in letter of September 7, 1944, he made a correction as to public domain lands, stating:

"Since the laws of the state of New Mexico do not cede exclusive jurisdiction over land reserved from the public domain for military purposes, excepting lands so reserved for the Ft. Wingate Military Reservation and the Fort Bliss Target Range, it was not the intention of this department to include in the list such reservations."

It will be observed, as the Secretary's letter states, that the New Mexico consent statute does not cede exclusive jurisdiction over land reserved from the public domain for military purposes. See, also, 16 U.S.C.A. § 480, recognizing concurrent jurisdiction as to national forest lands. It is not land acquired in the constitutional method as a place "for the erection of forts, magazines, arsenals, dockyards, and other needful buildings." The result is that the United States occupies and uses such lands in a proprietary capacity only. Fort Leavenworth R. Co. v. Lowe, supra; Surplus Trading Co. v. Cook, supra; Six Companies v. De Vinney, D.C., 2 F.Supp. 693. The lands remain subject to the jurisdiction of the state in matters not inconsistent with the free and effective use of the land for the purposes for which it was acquired. Johnson v. Morrill, supra. In Six Companies v. De Vinney, supra [2 F.Supp. 697], the court said:

"Upon the question of acquisition it is contended by plaintiff that the setting aside of this land out of the public domain and withdrawing the same from public entry 'was an acquisition thereof within the meaning of that statute as fully as if the United States had purchased the land from others.' The fallacy of this contention lies in the fact that after the land had been withdrawn from entry and set apart for the purposes specified, no change had occurred in ownership. All that was done with the land was in exercise of ownership, consisting of the withdrawal of offers for its acquisition by the public and the setting of the same aside for certain uses or purposes of the government. The Unit-

ed States did not acquire anything it did not already own. Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091; Woodruff v. North Bloomfield Gravel Mining Co. (C.C.) 18 F. 753."

We conclude that exclusive jurisdiction has not been ceded to the United States by the state as to so much of the area of Los Alamos Project within Precinct No. 17 as was carved from the public domain. Bona fide residence for the stated period on such portion of lands within the precinct meets the constitutional requirement in that particular for voting. Hence, so many of the votes cast in said primary election by residents of this portion of lands within the precinct by electors otherwise qualified should have been received and counted, if legally cast.

This brings us to the third and final question, viz., the effect of holding the election on the condemned lands within the precinct. As already shown, this land was under exclusive jurisdiction of the United States, except for the right to serve thereon civil and criminal process from state courts. In legal effect, the case is not different from what it would have been if the polling places had been located and the balloting had occurred in Colorado or some other state. Nor is the position of respondents aided by the enactment of L. 1947, c. 100, 1941 Comp.1947 Pocket Parts § 56-101, purporting to make residents

upon lands such as the condemned lands here involved residents of New Mexico within the constitutional sense. Sinks v. Reese, 19 Ohio St. 306, 2 Am.Rep. 397. In this case the court said:

" * * * It is not constitutionally competent for the general assembly to confer the elective franchise upon persons whose legal status is fixed as nonresidents of the state."

We are unable to avoid the conclusion that presence of the polling places outside the state, in legal intendment, is fatal to validity of the election. The voters participating in the election, some of whom without doubt were bona fide residents and qualified electors in New Mexico, did not, within the true meaning of state Const. Art. 7, § 1, personally appear and cast their ballots in the precinct of their residence "in New Mexico." Chase v. Lujan, 48 N.M. 261, 149 P.2d 1003. There are a few cases holding that under certain conditions an election held outside the precinct of the voter's residence, although inside the state, will not be declared invalid. People v. Graham, 267 Ill. 426, 108 N.E. 699, Ann.Cas.1916C, 391, and Smith v. Hackett, 129 Md. 73, 98 A. 140. In each case, the court cited somewhat critically and as holding otherwise or, at least, as being distinguishable, such cases as Chase v. Miller, 41 Pa. 403; Twitchell v. Blodgett, 13 Mich. 127, and Bourland v.

Hildreth, 26 Cal. 161, or one or more of them. These are cases cited approvingly and relied upon in reaching the conclusion we did in Chase v. Lujan, supra, and in the earlier case of Thompson v. Scheier, 40 N.M. 199, 57 P.2d 293, holding unconstitutional the law permitting absentee voting.

Even in those states permitting such voting, in order to avoid constitutional barriers, the ballot is deemed cast in the precinct where canvassed and counted—that of the voter's residence. There is here no ground for indulging this somewhat fictional theory since the ballots were cast, canvassed and counted outside any area in New Mexico able to supply basis for a voting residence. And, in view of our holdings in Thompson v. Scheier, supra; Chase v. Lujan, supra, and Baca v. Ortiz, 40 N.M. 435, 61 P.2d 320, that a statute purporting to authorize voting otherwise than through personal presence of the voter in the precinct of his residence in New Mexico was invalid, it would seem somewhat anomalous to hold that the same thing the statute could not lawfully authorize, where done without the purported authority of a statute, will be given the badge of legality. It follows that there was no primary election for Precinct No. 17 in Sandoval County on June 8, 1948.

Counsel for respondents as well as counsel appearing amicus curiae argue strongly that the conclusions we have reached are not to be indulged in view of the previous holdings of this court in Tenorio v. Tenorio, 44 N.M. 89, 98 P.2d 838, and State v. Mimms, 43 N.M. 318, 92 P.2d 993. We do not consider that the decisions reached in those cases are controlling. In the Tenorio case we were dealing with the status of Pueblo Indian lands in relation to the question of "residence" for purposes of a divorce suit. We noted the difference between their status for the purpose indicated and property acquired by the United States in the constitutional method when viewed for the same purpose. We said [44 N.M. 89, 98 P.2d 842]:

"The status of the Pueblo Indian lands is so different from that of United States property acquired in the 'constitutional method' mentioned in the majority opinion in Lowe v. Lowe, that we do not deem the case decisive of the question involved, even if we were prepared to affirm its correctness, a conclusion we should be slow to announce without further study in view of the persuasive reasoning and forceful precedents employed by Chief Justice Bond in his dissent from the majority view."

The seemingly tentative approval, provisional though it be, given the dissenting views of Chief Justice Bond in Lowe v. Lowe, supra, referred to in the quotation next above is, of course, to be qualified by what we today say and hold in the case before us.

The case of State v. Mimms, supra, presents more of a puzzle. It was a stipulated fact in the case that the land involved at Elephant Butte Dam was acquired for reclamation purposes pursuant to Art. 1, § 8, cl. 17 of the federal constitution. It was upon a record containing such a stipulation that the court trying the defendant, and this court in reviewing its judgment, decided the case. Counsel amicus curiae reminds us, however, a fact perhaps to be noticed judicially, that the lands having come to the United States under the Treaty of Guadalupe Hidalgo, did not fall within the purview of the consent or cession statute. Nevertheless, as he says, it must be assumed the case was tried on the record before the court. So viewed, he and counsel for respondents as well find in it a precedent in favor of their position. They support their analysis of the case by the vigorous contention that, if acquired by condemnation under federal constitutional provision mentioned, exclusive jurisdiction in the government passed immediately by virtue of the consent statute, as argued by Informant. Nevertheless, we upheld concurrent jurisdiction in the state.

On the other hand, counsel for Informant say the case was correctly determined, even on the stipulated fact as to manner of acquisition. The purpose of acquisition being to promote the government's program of reclamation, the mere fact that lands are acquired by condemnation, under U.S.Const. Art. 1, § 8, cl. 17, without more, does not necessarily conclude the question whether exclusive jurisdiction, ipso facto, passes with the cession. So runs the engaging argument of Informant's counsel. They cite and rely on Silas Mason Co. v. Tax Commission of State of Washington, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187; James v. Dravo Contracting Co., supra, and Johnson v. Morrill, supra.

We will not decide the issue between them. State v. Mimms having been correctly decided under the true fact as to character of the land involved, we have no hesitancy in saying we should decline to give it stare decisis effect whether correctly determined or not on a false fact, inadvertently stipulated to be true. So considered, we pass the effect of our decision in the Mimms case.

We are reminded by counsel of the several acts of jurisdiction exercised by the state on the lands in Precinct No. 17, Los Alamos Project, as to which the jurisdiction in the United States has been held to be exclusive. They point out, as the stipulated facts disclose, that residents of Los Alamos, including those who voted in this primary election, pay or bear the incidence of New Mexico income taxes, sales taxes, gasoline taxes and tobacco taxes; that cost and cost-plus fixed fee contractors doing work for the government on the condemned area within Precinct

No. 17 carry Workmen's Compensation insurance under the New Mexico Compensation statute; and so on as to certain other acts and things done according to state law. Most, although not all, of the matters stipulated as being done, are expressly authorized by congressional acts and represent a recession to the state of jurisdiction on the part of the government in the particulars indicated. See what is known as the Buck Act, 4 U.S.C.A. §§ 104 to 108, giving states authority to apply gasoline taxes, sales, use and income taxes on federal areas; also Act of June 25, 1936, 40 U.S.C.A. § 290, to the same purport regarding extension of state Workmen's Compensation Laws in federal areas.

To the extent any of the acts and things done on the condemned area in an application of state law are outside the purview of congressional authorization, they cannot impinge upon the exclusive jurisdiction of the federal government otherwise obtaining. If exclusive jurisdiction over certain landed areas be ceded to the United States by a state, such jurisdiction cannot be recaptured by the state by later statute without consent of the United States. Rogers v. Squier, 9 Cir., 157 F.2d 948; United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761. We find no federal statute receding jurisdiction of the condemned area to New Mexico in the particulars here involved. We are informed by counsel in argument that such a measure was introduced in the recent special session of the congress and never reached the floor for consideration due to the shortness of the session. The question is a legislative one and, however strong our wish that residents of this community might enjoy the elective franchise, we may not properly further that desire by an act of judicial legislation.

The conclusion that residents of the condemned area in Precinct No. 17 may not enjoy the elective franchise, based on residence there, does not necessarily mean they do not possess the right to vote elsewhere. As pointed out in a few of the so called "vote cases," particularly, In re Town of Highlands, supra, and Herken v. Glynn, supra, certain residents of the condemned area may still have a voting residence at the place of their former domiciles. N.M.Const. Art. 7, § 1, provides that no person shall be deemed to have acquired or lost a residence by reason of his presence or absence while employed in the service of the United States or of the state, nor while a student at any school. Any residents of the condemned area in said precinct, to whom this constitutional provision applies as well as those from other states with like constitutional provision, and, indeed, aside from the effect of any such provision, where the only thing evidencing an intention to change a former voting residence has been the futile act of seeking to acquire one in this federal area,

absent a fixed resolve to abandon the former residence at all events, may if otherwise qualified, cast his ballot at the place of former residence, in person, where so required as in New Mexico; or, by absentee voting in states, where permissible.

As to those residents of the portion of Precinct No. 17, which is not a part of the condemned area, who are qualified electors of the county and precinct ·in which they reside, a heavy responsibility rests on the Board of County Commissioners of Sandoval County to proceed forthwith with all dispatch and on their own motion to relocate the polling places, for the voting districts in such precinct to the end that the qualified electors therein may not be denied the right to vote in the forthcoming election. Time yet remains for such action and as well a remedy in the electors to compel same in the event of a refusal, which is not to be anticipated. See 1941 Comp.1947 Pocket Parts, § 56-201.

It follows from what has been said that the alternative writ should be made permanent.

It is so ordered.

McGHEE, J., and MARSHALL and ANDERSON, District Judges, concur.

FOWLER, District Judge, dissenting in part.

On Motion for Rehearing.

FOWLER, District Judge (dissenting).

The dissenting opinion heretofore filed by me disagreeing with the majority opinion, in part, is withdrawn and the following substituted therefor:

I do not agree that the election held in Precinct 17 (Los Alamos), Sandoval County, New Mexico, on June 8, 1948, was a nullity. The majority opinion admits that those persons who live on the 172.90 acres of former Forest Reserve lands in said precinct were or may have been qualified electors entitled to vote at said primary election. The election is declared a nullity, as to such persons, because all the polling places in said precinct were situated on the 407.39 acres of condemned land, which is said to be under the "exclusive legislation" or "exclusive jurisdiction" of the United States, and as such is deemed to be effectually "out of the State" for all election purposes.

New Mexico does have jurisdiction over said condemned land for some purposes. The State reserved some of this jurisdiction by its own acts of cession; some, on the other matters, was retroceded to the State by Acts of Congress, and it appears that the authorities agree that even after it has ceded jurisdiction the State still retains certain jurisdiction over the lands until and unless Congress acts by def-

initive legislation to prescribe for the acquired lands. If New Mexico retains any jurisdiction over this territory—and it does—then it cannot be a country "without the State." Subject to the right of the United States to exercise exclusive jurisdiction over it (which right the United States has waived by receding a part of such jurisdiction), this territory is still Precinct 17 of Sandoval County of the State of New Mexico. Collins v. Yosemite Park et al., 304 U.S. 518, 58 S.Ct. 1009, 82 L.Ed. 1502.

The County Commissioners of Sandoval County fixed the polling places at sites within the confines of Precinct 17. Provisions regarding the fixing of polling places within a precinct are directory merely, and it is not the policy of the law to disfranchise and penalize electors merely because the public officials in charge have made some slight miscalculation in setting up the voting sites, if they did so, especially where this did not result in depriving a single elector of his chance to vote, and where no fraud is charged or appears. The election was held and the polling places were in the precinct where the electors offered to vote. No function or control of the government was in the least embarrassed nor was its jurisdiction impinged upon thereby.

As pointed out in the Court's opinion, the weight of authority is to the effect that those persons who reside on lands which are acquired by the United States by the "constitutional method," as were the 407.39 acres of condemned lands in Precinct 17, do not have residence within the State within the meaning of the election laws. Although criticism might be leveled at this rule on principle, it is probably too well established now for change. It may be inferred from these facts that there were illegal votes cast at said election which should not be counted or considered in the result. We are not informed how many such votes there were, and of course no one knows for which one of the candidates any one or more or how many of the ballots were cast. The stipulation does not show that the number of these votes, by residents of the condemned lands, were sufficient to change the results, or were sufficient to invalidate the election in the precinct. I think the election was valid as to the qualified electors of said Precinct 17 living on the former Forest Reserve lands.

Holding these views, I am of the opinion that further proofs should be called for or allowed to show the number of ballots cast by residents of the 407.39 acres of condemned lands, and, if need be, for whom such ballots were voted, and that proper order of direction under the writ be made then according to the facts; or that, failing such further proofs, the alternative writ should be discharged.

Entertaining the views expressed, my dissent to the action of the majority in denying motion for rehearing is herewith noted.